IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
AT PEORIA

| | | |
|---|---|---|
| DERRICK T. COOKS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 07-1117 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S RESPONSE TO PETITIONER'S § 2255 MOTION

NOW COMES the United States of America, through its attorneys, Rodger A. Heaton, United States Attorney for the Central District of Illinois, and Greggory R. Walters, Assistant United States Attorney, and for its response to petitioner's motion under 28 U.S.C. § 2255 to vacate, set aside, or correct sentence states as follows:

### I. Procedural History

In July 2003, a jury convicted the defendant of possession with intent to distribute cocaine base (crack), in violation of 21 U.S.C. § 841(a)(1), and carrying a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). (R.7/22/03.DktEntry)[1] The jury made a special finding that the possession

---

[1] References to the documents in the criminal case, case no. 04-10004, are to the docket number on this Court's docket sheet, e.g., "R.__"; references to the documents in the present § 2255 case are to the docket number on this Court's docket sheet, e.g., "R.2255.___"; references to

with intent crime involved "[f]ive (5) grams or more of cocaine base (crack)." (R.37)

This Court sentenced petitioner to the mandatory minimum sentences of 120 months' imprisonment on Count One and 60 months' imprisonment (consecutive) on Count Two. (R.11/14/03.DktEntry; PSR.¶60; R.48) On direct appeal, the Seventh Circuit affirmed this Court's judgment, *see United States v. Cooks*, 2006 WL 372350, at **5 (7th Cir., Feb. 15, 2006), and the Supreme Court denied petitioner's petition for writ of *certiorari* on May 22, 2006, *see Cooks v. United States*, 126 S. Ct. 2309 (2006).

On May 9, 2007, petitioner filed a timely § 2255 motion, and on May 10, 2007, this Court directed the government to respond. (R.2255.1,6)

## II. Summary of the Argument

In his collateral attack, petitioner raises two related claims of ineffective assistance of counsel: counsel was ineffective at trial for stipulating that the controlled substance was 39.3 grams of cocaine base (crack) and at sentencing for not challenging the PSR finding of 39.3 grams of cocaine base (crack).

---

the presentence investigation report in the criminal case are to "PSR.__"; references to Appendix A to the government's response are to "App.__"; references to the trial transcript are to "Tr.__"; references to suppression hearing transcript are to "Supp.Tr.__" and references to petitioner's supporting memorandum are to "Pet.Mem.__". For the convenience of the Court, the government has attached to its response copies of those pages from the trial and suppression hearing transcript cited in this response in Appendices B and C, respectively.

Defense counsel's decision to stipulate was part of a reasonable trial strategy in which counsel, in a case involving overwhelming proof of the defendant's guilt, sought to disprove the element of "intent to distribute" and to focus the jury on that issue, rather than drug type.

Further, assuming for the sake of argument defense counsel's decision to stipulate to drug type fell below the objective standard of reasonableness, petitioner has failed to demonstrate any prejudice. Petitioner has not alleged, let alone come forward with any evidence indicating, that the substance was anything other than crack. Further, without the stipulation, experts who are familiar with crack cocaine testified that the substance was, in fact, crack. This testimony, combined with the undisputed fact the controlled substance was "cocaine base," is overwhelming proof the substance was, in fact, crack cocaine.

### III. Factual Background

A.     **Pretrial Discovery and Proposed Stipulations**

The government provided defense counsel with copies of a number of documents and other items in pretrial discovery. (App.1) These items included, but were not limited to:

- police reports detailing the events of the traffic stop and discovery of the handgun (App.5-7);

- police reports detailing the jail officials' subsequent discovery at the jail of the crack cocaine under petitioner's coat (App.6);

- a police report in which it is reported petitioner told a jail official that the substance that fell from petitioner's coat was "crack" (App.6);

- a laboratory report from the Illinois State Police, Morton Crime Lab, stating that 36. 8 grams of the substance was "cocaine base" and that the remaining 2.5 grams were not analyzed (App.3); and

- police reports containing physical descriptions of the crack cocaine by law enforcement officers who seized the crack at the jail and who field tested the crack (App.7,9,10).

On July 7, 2003, the undersigned AUSA sent a letter to defense counsel, enclosing proposed stipulations for the trial. (App.12-15) The proposed stipulations included the stipulation that "Government Group Exhibit 1 is 39.3 grams of cocaine base (crack) that was tested and weighed by . . . . a forensic scientist from the Illinois State Police Forensic Laboratory. . . ." (App.13) Defense counsel agreed to the proposed stipulations. (App.16)

## B.    Defense Strategy and Stipulations

During the pre-trial, trial, and sentencing phases, Robert F. Nemzin of Hickey & Nemzin, was petitioner's counsel. (App.17,¶¶2,3) Mr. Nemzin's experience as a defense attorney includes four years with the Cook County Public Defender's Office and 25 years in private practice engaging exclusively in the practice of criminal defense. (App.17-18,¶5) Mr. Nemzin estimates he has tried to

verdict over 50 felony bench trials and in excess of 15 jury trials. (App.18,¶5)
Prior to the trial in this matter, Mr. Nemzin's litigation experience included
approximately five federal jury trials in the U.S. District Court for the Northern
District of Illinois. (App.18,¶5)

After petitioner retained Mr. Nemzin, counsel reviewed all of the discovery
materials in the case. (App.18,¶¶6,7) Based on his review, Mr. Nemzin's
professional opinion was that the government would be able to establish beyond
a reasonable doubt petitioner's possession of the controlled substance and
handgun. (App.19,¶7) Mr. Nemzin believed the evidence of petitioner's
possession of these items was overwhelming. (App.19,¶7)

Mr. Nemzin discussed the discovery materials with petitioner and
recommended the defense file a motion to suppress. (App.19,¶7) This Court
denied the motion to suppress. (R.07/03/03.DktEntry) Before ruling on the
motion to suppress, this Court commended counsel on the quality of his brief
and advocacy. (Supp.Tr.107)

Following the suppression hearing, Mr. Nemzin consulted with petitioner
concerning petitioner's options. Mr. Nemzin told petitioner that, if convicted, he
was facing mandatory minimum sentences of 10 years' imprisonment on Count
One and 5 years' imprisonment on Count Two. Mr. Nemzin further advised

petitioner that the only way for petitioner to receive sentences below the mandatory minimum sentence was to cooperate with the government. (App.19,¶10)

Petitioner advised he did not want to cooperate with the government. Therefore, Mr. Nemzin discussed with petitioner the theory of defense for trial. Having determined the evidence of the possession of the drugs and handgun was overwhelming and could not be disputed, Mr. Nemzin and petitioner agreed the only viable defense was that petitioner was guilty of simple possession of the drugs. Mr. Nemzin advised petitioner that if he prevailed on this theory, then, as a matter of law, petitioner could not be found guilty of the possession of a firearm in furtherance of a drug trafficking crime. (App.19-20,¶11)

Further, Mr. Nemzin and petitioner agreed that, as a matter of trial strategy, the defense would stipulate to weight and drug type. (App.20,¶12) Mr. Nemzin's recommendation to enter into the stipulation was based on his review of the discovery materials, including police reports that referred to the substance as "crack," and the laboratory report that contained a finding by a forensic scientist that the substance was "cocaine base." (App.20,¶12)

During the discussions between Mr. Nemzin and petitioner, petitioner did not contend the crack cocaine was something other than crack cocaine.

(App.20,¶13) Further, after trial, but prior to sentencing, petitioner never raised a question concerning the nature of the controlled substance. (App.20,¶14)

Prior to jury selection, Mr. Nemzin informed the Court of the defense's trial strategy and asked this Court to inquire of petitioner whether petitioner agreed with the strategy. (Tr.8-10) This Court then conducted a colloquy with petitioner concerning the theory of defense, during which petitioner made clear he agreed with the theory of defense. (Tr.8-10)

The parties also tendered to the Court their stipulations signed by petitioner. These stipulations included: "Government Group Exhibit 1 is 39.3 grams of cocaine base, that is crack cocaine, that was tested and weighed . . . by a forensic scientist from the Illinois State Police Forensic Laboratory. . . ." (Tr.13-14,55; R.34). The Court engaged in a colloquy with petitioner concerning the stipulations, during which petitioner indicated his agreement with the stipulations. (Tr.13-14)

C.     **The Trial**

1.     **The Evidence**

Officer Anthony Fillingham of the Macomb Police Department testified that he stopped petitioner for speeding in the late hours of January 1, 2003. (Tr.58-59) During the traffic stop, Officer Kenneth Neaver, a K-9 handler with the

7

Macomb Police Department, provided back up. (Tr.87) Officer Fillingham

testified that he requested Officer Neaver perform a walk around with the K-9.

During the walk around, the dog alerted on petitioner's car. (Tr.87-88) During a

subsequent search of the car, Officer Fillingham found a loaded .380 handgun,

with one round chambered, in the console of the car. (Tr.64-65,67-68)

The officers arrested petitioner and transported him to the McDonough

County Jail. (Tr.69) During the jail search of petitioner, one of the searching

officers asked petitioner to remove his coat. (Tr.98-99) When petitioner removed

his coat, a clear plastic bag fell to the floor. (Tr.99) The searching officers then

retrieved the bag that contained "numerous cream-colored rocks individually

wrapped." (Tr.100-01) Officers later determined that the clear plastic baggie

contained 27 individually wrapped rocks of what appeared to be crack cocaine.

(Tr.30)

In addition to the parties' stipulation that the controlled substance was

cocaine base (crack), Inspector Robert Bay, then an officer with the West Central

Illinois Task Force ("WCITF"), and Officer Timothy Moore, of the Peoria Police

Department, both testified that the controlled substance was crack cocaine.

(Tr.30,125-26)

8

As of the trial date, Inspector Bay had been with the WCITF for five years. (Tr.28) His duties with the task force included general drug enforcement, controlled purchases, and undercover buys. (Tr.29,39-40) Having had the opportunity to observe the crack cocaine, Inspector Bay testified:

> Q    What [did Government Group Exhibit 1] appear to be [when you first saw it]?
>
> A    It appeared to be crack cocaine.
>
> Q    Now you have had experience with crack cocaine in your duties?
>
> A    Yes.
>
> Q    You know there are different types of cocaine, and in fact different types of cocaine base, but this was crack?
>
> A    Yes.

(Tr.30)

Officer Tim Moore, who has testified as an expert in this Court on multiple occasions had the following experience as of the trial in July 2003:

- a two-week training program at a DEA school during which he received training in the identification and packaging of drugs, including crack cocaine;

- a one-week training program at the University of Northern Florida, a portion of which addressed the packaging and transportation of drugs;

9

- multiple terms with the Peoria Police Department Vice and Narcotics Unit;

- hundreds of arrests in matters involving drugs, including crack cocaine;

- approximately 24 hand-to-hand purchases of drugs as an undercover officer;

- a term with the PPD street crimes unit, the focus of which is on gang activity and drug sales;

- numerous interviews of crack cocaine users and dealers; and

- testifying as an expert witness in approximately 12 cases (approximately 6 cases in federal court) concerning the means and method of crack cocaine distribution in Central Illinois.

(Tr.106-14)

During Officer Moore's testimony, he described for the jury the differences between cocaine base in its original form in South America, powder cocaine, and cocaine base (crack). (Tr.125) After observing the crack cocaine in this case, Officer Moore testified:

Q    In your experience – or is this crack cocaine consistent with the crack cocaine you have had experience with? Specifically it in a rock-like form and is it in that off-white color?

A    It's very consistent, typical crack cocaine.

(Tr.126)

**2.    Defense Counsel's Incorporation of the Theory of Defense**

10

Mr. Nemzin wove his and petitioner's theory of simple possession of the crack throughout the trial, from opening statement, through cross-examination of those witnesses Mr. Nemzin chose to question, and in the closing argument. (Tr.23-27,39-50,78-83,127-36,184-94)

Consistent with the theory of defense, Mr. Nemzin argued for a lesser included, simple possession jury instruction, providing both written and oral argument to the Court. (Tr.150-160) This Court ultimately denied Mr. Nemzin's request for the jury instruction. (Tr.160) However, in denying the request for the jury instruction, this Court commented, "Here, defense counsel is very aggressively and effectively arguing *as best he can under this record* [for the lesser included offense instruction]." (Tr.159-60) (emphasis added)

Despite not prevailing on the lesser included offense instruction, Mr. Nemzin vigorously argued in his closing argument that the government had failed to meet its burden of proving the intent to distribute element of the § 841(a)(1) offense. (Tr.184-194)

Following the parties' closing arguments and the Court's instructions to the jury, this Court stated:

> I want to thank counsel for both sides. I think everyone really did a professional job representing your clients and you did that in a very civil manner and I really appreciate that as the trial judge. Thank you.

11

(Tr.209)

**Argument**

Petitioner's claims of ineffective assistance of counsel are without merit. His § 2255 motion, supporting memorandum, and affidavit individually and collectively fail to demonstrate either cause or prejudice.

**A.    Legal Standards**

In *Strickland v. Washington*, 466 U.S. 688 (1984), the Supreme Court set forth its now familiar two-part test for determining ineffective assistance of counsel claims, holding a petitioner must demonstrate that: (1) the representation "fell below an objective standard of reasonableness," *id.* at 688; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, *id.* at 694."

For the first element, a court's review of the attorney's performance is "highly deferential" and "reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. *Strickland* counsels that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

Stipulations can constitute the exercise of sound trial strategy. *United States v. Giangrosso*, 779 F.2d 376, 381 n.3 (7th Cir. 1986). In fact, the Seventh Circuit has held that a defense attorney's going so far as conceding guilt to one count of a multi-count indictment to bolster the case for innocence on the remaining counts is a valid trial strategy that does not rise to the level of deficient performance. *See United States v. Holman*, 314 F.3d 837, 840 (7th Cir.) (collecting cases), *cert. denied*, 538 U.S. 1058 (2003). Concessions by the defense, when there is overwhelming evidence, are thought to build credibility with a jury, "creating goodwill and trust towards arguments attacking remaining charges." *Id.*

In the context of this particular § 2255 motion, to demonstrate the second *Strickland* element, petitioner must offer evidence that the controlled substance was something other than crack cocaine. *United States v. Trice*, 484 F.3d 470, 476 (7th Cir. Apr. 30, 2007), *citing with approval United States v. Gray*, 182 F.3d 762, 768 (10th Cir. 1999) ("Having failed to claim the existence of evidence that the drug involved was not crack, appellant cannot meet the prejudice prong of his ineffective assistance of counsel claim").

## B.    Petitioner Has Failed To Demonstrate Prejudice

The Seventh Circuit is aware of only two types of cocaine base: crack cocaine and unprocessed, raw cocaine. *United States v. Booker*, 260 F.3d 820, 823-24

14

(7th Cir. 2001). These are the two types of cocaine base Officer Moore testified about during petitioner's trial. (Tr.125-26) Petitioner has not offered any evidence that the controlled substance he possessed was the unprocessed, raw cocaine base found in South America. (Tr.125) Further, petitioner – who the jury found beyond a reasonable doubt possessed with intent to distribute the 39.3 grams of controlled substance that fell from his coat at the jail – has not come forward with any evidence (or even alleged) that the substance was something other than crack. Certainly the drug-dealing petitioner knows what type of product he intended to peddle on January 1, 2003. Pursuant to *Trice*, *supra*, petitioner's failure to come forward with evidence of the drug type defeats his claim of ineffective assistance of counsel. *See Trice*, 484 F.3d at 476; *see also Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985) (to prevail in his contention that counsel should have advised defendant of a potential defense, the defendant must show that the defense likely would have prevailed at trial).

Similarly, petitioner's claim that his attorney did not advise him there were different types of cocaine base gets him no further toward demonstrating prejudice. When an ineffectiveness claim is based on an attorney's alleged failure to advise his client of a potential defense, the prejudice inquiry turns on the likelihood of success of the defense. *Id.* at 59. In this case, the evidence of the drug

15

type was overwhelming, even without the stipulation. Had petitioner not

stipulated to the drug type, the government would have called the forensic

scientist as a witness to testify concerning the results of her examination: 36.8

grams of white chunky substance that was cocaine base and 2.5 grams of white

chunky substance she did not analyze.[2] (App.3) Inspector Bay and Officer Moore,

both of whom are familiar through their law enforcement experience with crack

cocaine, testified that the off-white, rock-like substance was crack cocaine. These

officers' expertise in drug identification is every bit as relevant, important, and

admissible as the lab results. *See United States v. Anderson*, 450 F.3d 294, 301 (7th

Cir. 2006) ("We have repeatedly held that the government can prove a substance

is crack by offering testimony from people familiar with the drug . . . .") The

officers' testimony, combined with the results of "cocaine base" from the lab,

point toward the inescapable conclusion that the substance at issue was, in fact,

crack. At a minimum, petitioner has failed to demonstrate that his now proposed

---

[2]Had the defense not stipulated to the drug type and weight, the government would have resubmitted the crack cocaine to the lab to complete the testing of the remaining 2.5 grams prior to trial, as indicated in its July 7, 2003, letter to Mr. Nemzin. (App.12)

Further, petitioner misstates in his memorandum of law that the forensic scientist tested only 2.5 grams of the total 39.3 grams of the controlled substance. (Pet.Mem.9), It's the other way around: 36.8 of the 39.3 grams were forensically tested. (App.3) To the extent petitioner is arguing his attorney was ineffective for stipulating that the 2.5 grams that was not tested was cocaine base (crack), he cannot show prejudice. The 36.8 grams that were tested, in conjunction with petitioner's prior felony drug conviction, were more than enough to meet the 10-year mandatory minimum threshold of 21 U.S.C. § 841(b)(1)(B).

defense that the substance was not crack cocaine would have likely prevailed at trial in light of the facts in this case.

In summary, petitioner stated it correctly on the fifth page of his supporting memorandum: "The baggie [that fell from my jacket at the jail] contained over 20 individually wrapped baggie[s] *containing a total of 39.3 grams of crack cocaine*." (Pet.Mem.5) (emphasis added) Because petitioner has not demonstrated prejudice, his claims of ineffective assistance of counsel must fail.

## C.    Petitioner Has Failed To Demonstrate Cause

Petitioner's failure to demonstrate prejudice is the death knell to his § 2255 motion. The government, however, would do an injustice to Mr. Nemzin if it did not address his professional and excellent representation of petitioner.

This Court recognized and complimented Mr. Nemzin's effective advocacy on at least three occasions on the record during the pendency of the criminal case. (Supp.Tr.107; Tr.159-60,209) While this Court's comments to Mr. Nemzin were general in nature and did not clairvoyantly address petitioner's current claims of ineffective assistance, it is clear this Court respected Mr. Nemzin's abilities as a defense attorney.

Mr. Nemzin – faced with what he believed in his professional opinion (and what the jury ultimately determined) was overwhelming proof of petitioner's

17

possession of both the crack and the handgun, a client who persisted in his

constitutional right to a jury trial, and case discovery describing the controlled

substance as "crack," "cocaine base," "chunky," and "rock like" – had to make

every effort to turn a sow's ear into a silk purse. He did so by coming up with a

theory of defense, with which his client agreed on the record, and by not

contesting those matters for which there was overwhelming proof. *See United*

*States v. Balzano*, 916 F.2d 1273, 1294 (7th Cir. 1990) (counsel's strategic chose to

choose one defense or another is rarely second-guessed). Mr. Nemzin's decision

to enter into certain stipulations with the government in a case with

overwhelming proof of guilt is easily and appropriately explained as a trial

strategy of an experienced defense attorney: get the jury to focus on those issues

on which the defense had a chance to prevail and lend credibility to his theory

and arguments by conceding those issues on which there was no chance of

prevailing. The government respectfully suggests this Court is not in a position to

second-guess Mr. Nemzin's trial strategy unless it engages in the type of

hindsight distortion prohibited by *Strickland*. *See* 466 U.S. at 689.

This Court need not rely on the strong presumption of effective counsel in

finding Mr. Nemzin's representation was effective. Nevertheless, given there is

such a presumption, it is even clearer petitioner cannot demonstrate his

attorney's representation failed to meet the constitutional threshold of

effectiveness.[3]

## IV. Conclusion

For the foregoing reasons, the United States of America respectfully

requests this Court deny petitioner's § 2255 motion.

Respectfully submitted,

UNITED STATES OF AMERICA

RODGER A. HEATON
UNITED STATES ATTORNEY


By:    /s/Gregory R. Walters
       Assistant United States Attorney
       One Technology Plaza
       211 Fulton Street, Suite 400
       Peoria, Illinois 61602
       Tel: (309) 671-7050
       Fax: (309) 671-7259
       E-mail: greggory.walters@usdoj.gov

---

[3]Concerning petitioner's argument that his attorney was ineffective for failing to object at sentencing concerning the drug type, this is a non-issue. Given defendant's stipulation to the drug type and weight, such an objection at sentencing would have been frivolous. Further, for the same reasons petitioner cannot show prejudice with respect to the stipulation in the context of the trial, he cannot demonstrate prejudice in the context of his sentencing hearing.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 6, 2007, I filed the foregoing with the Clerk of

the Court using the CM/ECF system and served a copy of the foregoing, via first

class U.S. mail, postage prepaid, to the following person:

> Derrick T. Cooks
> Inmate Registration No. 13084-026
> FPC Duluth
> P.O. Box 1000
> Duluth, MN 55814

<u>/s/ Kimberly Ritthaler</u>
Legal Assistant

# APPENDIX A TO THE GOVERNMENT'S RESPONSE TO PETITIONER'S § 2255 MOTION

April 23, 2003, letter to Mr. Nemzin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

Illinois State Police lab report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Macomb Police Department incident report form . . . . . . . . . . . . . . . . . . . . . . 4-7

Macomb Police Department incident report form . . . . . . . . . . . . . . . . . . . . . . 8-11

July 7, 2003, letter to Mr. Nemzin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Proposed stipulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-15

July 11, 2003, letter to Mr. Nemzin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Affidavit of Robert F. Nemzin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-21





**U. S. Department of Justice**

*United States Attorney*
*Central District of Illinois*

---

One Technology Plaza                                (309) 671-7050
211 Fulton Street, Suite 400
Peoria, Illinois 61602                          FAX (309) 671-7259

April 23, 2003

Mr. Robert F. Nemzin
Hickey and Nemzin
2536 South California Ave.
Chicago, Illinois 60608

Re:   **United States v. Derrick Cooks**, Case No. 03-10004

Dear Rob:

It was my pleasure meeting you today. I look forward to your representation of Mr. Cooks in this matter.

I want to ensure that you have all of the discovery my office had provided to Mr. Alvarado during his representation of Mr. Cooks. You should have in your possession documents 001 through 124. Additionally, you should have two videotapes from Officers Fillingham's and Neaver's respective dash cameras and a cassette tape of radio transmissions pulled from the Macomb PD 911 computer. If you do not have all of these items, please notify me as soon as possible.

Additionally, please find enclosed documents 125 and 126, which I received on Monday, April 21, 2003.

Our office has an open-file discovery policy, with certain exceptions that are not applicable in this case. Therefore, any documents or other tangible objects in my possession have been copied and provided to defense counsel or have been made available to defense counsel for inspection.

You may inspect the physical evidence in the Macomb PD's possession, *i.e.*, drugs, packaging, and gun, at a mutually convenient time at our office or at the Macomb PD. I suggest that if you desire to see these items that I make them available for your inspection prior to or after the suppression hearing. Just let me know so I can have my case agent bring them from the Macomb PD.

Concerning your client's possible cooperation, I want to make sure that you are fully informed about our office's policy on 5K1.1 motions and Rule 35 motions. We have a "one bite at the apple" policy. This means that, assuming your client cooperates, he will get credit for his cooperation through either a 5K1.1 motion (and a § 3553(e) motion when appropriate) at

App. A, p.1

Robert F. Nemzin
April 23, 2003
Page 2

sentencing or a Rule 35 motion post-sentencing.  He would not receive both a 5K1.1 motion and Rule 35 motion.

Additionally, any cooperation agreement with the government would include various waivers, to include the waiver of the rights to appeal and collateral attack.  If you would like to review a plea agreement with your client, please let me know.  I will send you a draft agreement.

Lastly, I want to reiterate what I told you today in court concerning the suppression hearing.  If your client persists in his motion to suppress, he will lose his option to cooperate with the government.

We can discuss any questions you might have when you call the week after next.  Enjoy your vacation.


Very truly yours,

JAN PAUL MILLER
UNITED STATES ATTORNEY

**GREGGORY R. WALTERS**
Assistant United States Attorney

Enclosures

03- 10137 WM
BAY 9972

# ILLINOIS STATE POLICE
Division of Forensic Services
Morton Forensic Science Laboratory
1810 South Main Street
Morton, Illinois 61550-2983
(309) 284-6500 (Voice) * 1-(800) 255-3323 (TDD)

Rod R. Blagojevich
*Governor*

January 28, 2003

Sam W. Nolen
*Director*

INSPECTOR ROBERT BAY
ISP DOO ZONE 4 TASK FORCE
1034 WEST JACKSON
MACOMB IL 61455

Laboratory Case #M03-000079
Agency Case #03-10137

OFFENSE: Violation of Controlled Substances Act
SUSPECT: Derrick T. Cooks

The following evidence was submitted to the Morton Forensic Science Laboratory by Inspector Bay on January 9, 2003:

| LAB/AGENCY | ITEM SUBMITTED | FINDINGS |
|---|---|---|
| 1A/1 | 36.8 grams of chunky substance from 24 items | Cocaine base |
| 1B/1 | 2.5 grams of three items containing chunky substance | Not analyzed |

730 ILCS 5/5-9-1.4(b) states that a criminal laboratory analysis fee of $100 shall be imposed for persons adjudged guilty of an offense in violation of the Cannabis Control Act or the Illinois Controlled Substances Act.

Respectfully submitted,

Tramellie Collins
Forensic Scientist

App. A, p.3

**0092**

# MACOMB POLICE DEPARTMENT

MA-03-00024    01/01/2003

OFFICER: 126    ANTHONY FILLINGHAM

☐ Investigation  ☐ Accident  ☑ Arrests Made  ☐ Suspects

## Incident Report Form

| 1. Log Number MA-03-00024 | 1a. Incident Number 03-24 | 1b. File Number CD-03-000064 | 1c. Case Number 12A-1-03 | 2. UCR 2020 | POSSESSION CONTROLLED SUB |
|---|---|---|---|---|---|
| 3. Incident Type DRUG2  DRUG POSSESSION | | 4. Dispatcher 9110001 | 5. Source OFFCR | 6. District C | 7. Status 10-95 |
| 8. Date Received 01/01/2003 | 8a. Rcvd 2315 | 8b. Disp 2315 | 8c. Arrv 2315 | 8d. Clrd 0109 | 9. Disposition REPORT  REPORT TO FILE |

| INCIDENT OCCURRED AT OR BETWEEN | 8e. Earliest Date and Time 01/01/2003    2315 | 8f. Latest Date and Time 01/01/2003    2315 |
|---|---|---|

| 10. Location 318  W  JACKSON ST MACOMB    IL    61455 | 10a. Cross Street | 10b. Intersection ☐ |
|---|---|---|

| 11. Premise Code BUSINE  GENERAL BUSINESS | 12. Business Name AYERCO (WEST) CONVENIENT CENTER |
|---|---|

### 13. Modus Operandi Coding

ENTRY:                                VICTIM:
EXIT:                                  PROPERTY:
METHOD:                                AREA:
                                       TIME OF DAY:

### 14. Caller / Complainant Type    N - Normal

### 15. Involved Persons

| Arr DATE    ARREST# | STREET ADDRESS PriCHG    DESCRIPTION | INVOL Cnt  AddlCHG | DOB DESCRIPTION | SSN | R S | PHONE Cnt PL    Vd |
|---|---|---|---|---|---|---|
| COOKS, DERRICK | 5125 S WOOD | ARR | 11/05/1973 | 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 | B M | (773) 476-2294 |
| | CHICAGO, IL  60609 | | | | | |
| 01/02/2003  MC-00053 | 720 ILCS 5/ UNLAWFUL USE OF A 1 | | 625 ILCS 5/ | | | 0 |
| | | | 720 ILCS 57 POSS OF CONTROLLI 1 | | | |
| | | | 625ILCS 5/1 | | | 0 |

### 16. Involved Vehicles

| | STATE | PTYPE | INVOL | YEAR | MAKE | MODEL | COLOR | VIN |
|---|---|---|---|---|---|---|---|---|
| 2099673 | IL | PC | TRAF | 1999 | CHEV | | BLU | |

### 17. Name / Vehicle Involvement

| NAME | | INVOL | PLATE | ST | YEAR | MAKE | MODEL | COLOR |
|---|---|---|---|---|---|---|---|---|
| COOKS | DERRICK | OPRT | 2099673 | IL | 1999 | CHEV | | BLU |
| COOKS | DERRICK | OWNR | 2099673 | IL | 1999 | CHEV | | BLU |

### 18. Citations

| | NAME | VIOL | ORDINANCE | PLATE | STATE | YEAR | MAKE | MODEL |
|---|---|---|---|---|---|---|---|---|
| U005642 | COOKS, DERRICK | TRAF | 625.5/11-502A | 2099673 | IL | 1999 | CHEV | |
| U005641 | COOKS, DERRICK | TRAF | 625.5/11-601B1 | 2099673 | IL | 1999 | CHEV | |

### 20. Property

| | UCR | USER | DATELOGGED | BRAND | MODEL | SERIAL | AISLE | BIN |
|---|---|---|---|---|---|---|---|---|
| MA-001239 | K | DRUGS | 01/02/2003 03:25 | SUBSTANCE | | | EX 1 | |
| WHITE ROCKY SUBSTANCE | | | | | | | VALUE: | |
| MA-001240 | G | GUN2 | 01/02/2003 03:39 | JENNINGS | 380 | | EX 2 | |
| 1 .380 SILVER JENNINGS SEMI-AUTO PISTOL☐☐1 LOADED MAGAZINE FOR PISTO | | | | | | | VALUE: | |
| MA-001241 | K | DRUGS | 01/02/2003 03:41 | CANNABIS | | | EX 3 | |
| | | | | | | | VALUE: | |

| WSIRF-01 | MA-03-00024    01/01/2003 | ☐ APPROVED |
|---|---|---|

**001**

# MACOMB POLICE DEPARTMENT

MA-03-00024     01/01/2003

OFFICER: 126     ANTHONY FILLINGHAM

☐ Investigation ☐ Accident ☑ Arrests Made ☐ Suspects

## Incident Report Form

| MA-001242 | K | TAPE | 01/02/2003 03:42 | | EX 4 | |
| | | VIDEO TAPE FROM C4 | | | VALUE: | |
| MA-001244 | A | MONEY | 01/02/2003 04:38 | | EX 5 | |
| | | $100 IN 5 $20'S | | | VALUE: | $100.00 |
| | | | | | Total Property: | $100.00 |

| 22. Comments / Narratives | CREATED BY / ON | UPDATED BY / ON | LOCK |
|---|---|---|---|
| Police Dispatcher | 9110001   01/02/2003 01: | | N |

121/TRANSPORTING 10-95

NORMS 10-76

CR# 12A-1-03

VEHICLE IN TOW

| Narrative by Fillingham | mpd106   01/02/2003 | mpd126   01/05/2003 | N |
|---|---|---|---|

R/O Anthony Fillingham #126               12A-1-03

On 01/01/03 at approximately 11:15 p.m., I observed a blue Chevrolet car with Illinois license plates, 2099673, driving eastbound in the 800 block of West Jackson Street. I was driving westbound at the time. My radar indicated that the car was traveling 40 mph. The speed limit in that area is 30 mph.

I activated my emergency lights and stopped the car in the east parking lot of Ayerco West. I identified the driver as Derrick Cooks. I noticed a tattoo on Cooks' right hand between his thumb and first finger which I believed to be a gang-related tattoo. Cooks told me that he just got off of work from Wal-Mart and was going home. That did not make any sense to me since he was driving away from his home at 204 Shannon Drive. He told me that he drove home and then decided to go get gas. Cooks seemed very nervous while I was speaking with him.

I returned to my squad car and checked Cooks' criminal history. I was informed that he had past arrests for dangerous drugs and weapons offenses. I also learned that he had a prior ticket for speeding in the last twelve months. I began to complete a ticket for speeding.

I noticed that Cooks was leaning to the right in his seat and that his hands were moving in the area of the center console. I approached Cooks' car from the passenger side, but could not discover what he was doing. I returned to my squad car and began working on the ticket again. Officer Neavear arrived to assist me. I informed him of everything that I had observed and learned. I asked him to do a walk-around of the car while I was completing the ticket. Officer Neavear completed the walk-around and informed me that his K9 Hondo had indicated on the car.

I completed the traffic ticket and asked Cooks to step out of the car. I informed him that a K9 had indicated the presence of contraband in the car. I gave him his ticket for speeding. He put his hand in his pocket and asked him to keep it in view. I asked if I could pat him down to make sure he wasn't armed. He agreed. I patted down the exterior of his jacket and pants pockets, but discovered nothing. I asked him to step back with Officer Neavear while I searched his car.

| WSIRF-01 | MA-03-00024 | 01/01/2003 | ☐ APPROVED BY | ON |

002

# MACOMB POLICE DEPARTMENT

MA-03-00024     01/01/2003

OFFICER: 126     ANTHONY FILLINGHAM

☐ Investigation ☐ Accident ☑ Arrests Made ☐ Suspects

## Incident Report Form

I opened the rear driver's side door and began to search the car. I heard Officer Neavear say, "Gun!" I turned back towards Officer Neavear and saw him putting handcuffs on Cooks. I assisted him with handcuffing. He told me that Cooks had admitted that there was a gun in the center console. I located the pistol (.380 silver Jennings semi-automatic) in the center console. Also located inside the car were two cannabis seeds and an open bottle of cognac. One seed was located in the passenger seat and the other was on the floorboard of the rear seat passenger. The cognac was beneath the driver's seat and was approximately 2/3 full.

The pistol had a loaded magazine of ball ammunition and a round was in the chamber. The pistol was on safe.

Jail staff informed me that they had discovered a baggie of white rocky substance on Cooks. While placing him in a holding cell, a baseball sized packet fell out of the front of his jacket. Jailer Hoyt confiscated the packet and asked him what it was. Cooks replied, "Crack." I placed the packet into evidence after weighing it at 46.5 grams. There are a large number of rocks inside the baggie that are each individually wrapped.

The jail also turned over $100 in twenty dollar bills to me that Cooks had on him.

After consulting with Sgt. Barker, it was decided to seize the vehicle. Officer Neavear had the vehicle towed to the city impound lot.

I spoke with Cooks, but he refused to answer any questions and stated that he did not want to talk about the drugs. He said, "I've been caught so I don't see any point in talking."

Cooks was processed and lodged on charges of unlawful use of firearm and possession of cocaine between 15 and 100 grams. I also issued Cooks another ticket for illegal transportation of open alcohol by driver.

The pistol, white rocky substance, two cannabis seeds, the video tape of the traffic stop, and the $100 dollars were all placed into evidence.

Supplement by Neavear     mpd106   01/02/2003     mpd106   01/02/2003     N.

R/O Neavear, 106

On 01/01/03 at 11:15 pm, I assisted Ofc. Fillingham on a traffic stop at Ayerco West.

Ofc. Fillingham requested, based on reasonable suspicion (air freshner, criminal history, nervousness, etc.), that I conduct a free air sniff (walk around) of the vehicle with K-9. While Ofc. Fillingham completed paperwork related to the traffic stop, I deployed the K-9. K-9 "Hondo" alerted on the trunk area, indicating the presence of a narcotic odor in the vehicle. Ofc. Fillingham and I spoke with the driver, Derrick Cooks. Cooks admitted that he and his girlfriend often drive around while smoking marijuana. Cooks stated that he had just smoked marijuana in the car yesterday because of New Years Eve.

# MACOMB POLICE DEPARTMENT

MA-03-00024    01/01/2003

OFFICER: 126    ANTHONY FILLINGHAM

☐ Investigation ☐ Accident ☑ Arrests Made ☐ Suspects

## Incident Report Form

Ofc. Fillingham searched Cooks, and I stood with Cooks while Ofc. Fillingham searched the vehicle. Cooks began acting very nervously and mumbled to himself. Cooks then stated that there was a gun in the car. I yelled to Ofc. Fillingham that there was a gun in the car. I pushed Cooks onto the hood of the car, and Ofc. Fillingham assisted me in handcuffing him. I searched Cooks with the intention of recovering other possible weapons, and he was placed in the squad car.

Two marijuana seeds were later found in the car.

supplement by c mason       mpd125   01/03/2003       mpd125   01/03/2003       N

R/O

On 01/03/03 at approximately 2:45 p.m. Detective Lenardt and myself field tested the suspected crack cocaine from exhibit #1. I opened the sealed plastic bag that Officer Fillingham placed the bag of suspected crack cocaine in, and removed the suspected crack cocaine. I made a small cut in a corner of the plastic bag containing the suspected cocaine, and removed one small baggie that contained two hard cream colored rocks. I tested a small amount of one of the rocks, and it field tested positive for cocaine. I placed the cocaine, and the plastic bag it was in, back inside the plastic bag Officer Fillingham had it in. I placed those bags inside another clear plastic bag and sealed it. Detective Lenardt and myself initialed the bag.

Supplement by Fillingham #126     mpd126   01/05/2003     mpd126   01/05/2003       N

R/O Anthony Fillingham #126

I identified Derrick Cooks during the traffic stop by obtaining his driver's license from him. The picture on the license matched Cooks' face. I verified that it was a valid driver's license with dispatch.

| **E911 COMM CENTER** | | | **MA-03-00024** | **01/01/2003** |
|---|---|---|---|---|

OFFICER: 126   ANTHONY FILLINGHAM

☐ Investigation  ☐ Accident  ☑ Arrests Made  ☐ Suspects

**Incident Report Form**

| MA-001316 | K  TAPE   01/10/2003 23:09  VIDEO TAPE   K9<br>IN CAR VIDEO OF TRAFFIC STOP | | EX6<br>VALUE: |
|---|---|---|---|

Total Property:     $100.00

| 22. Comments / Narratives | CREATED BY / ON | UPDATED BY / ON | LOCK |
|---|---|---|---|
| Police Dispatcher | 9110001  01/02/2003 01: | | N |

121/TRANSPORTING 10-95

NORMS 10-76

CR# 12A-1-03

VEHICLE IN TOW

| Narrative by Fillingham | mpd106  01/02/2003 | mpd126  01/05/2003 | N |
|---|---|---|---|

R/O Anthony Fillingham #126                    12A-1-03

On 01/01/03 at approximately 11:15 p.m., I observed a blue Chevrolet car with Illinois license plates, 2099673, driving eastbound in the 800 block of West Jackson Street. I was driving westbound at the time. My radar indicated that the car was traveling 40 mph. The speed limit in that area is 30 mph.

I activated my emergency lights and stopped the car in the east parking lot of Ayerco West. I identified the driver as Derrick Cooks. I noticed a tattoo on Cooks' right hand between his thumb and first finger which I believed to be a gang-related tattoo. Cooks told me that he just got off of work from Wal-Mart and was going home. That did not make any sense to me since he was driving away from his home at 204 Shannon Drive. He told me that he drove home and then decided to go get gas. Cooks seemed very nervous while I was speaking with him.

I returned to my squad car and checked Cooks' criminal history. I was informed that he had past arrests for dangerous drugs and weapons offenses. I also learned that he had a prior ticket for speeding in the last twelve months. I began to complete a ticket for speeding.

I noticed that Cooks was leaning to the right in his seat and that his hands were moving in the area of the center console. I approached Cooks' car from the passenger side, but could not discover what he was doing. I returned to my squad car and began working on the ticket again. Officer Neavear arrived to assist me. I informed him of everything that I had observed and learned. I asked him to do a walk-around of the car while I was completing the ticket. Officer Neavear completed the walk-around and informed me that his K9 Hondo had indicated on the car.

I completed the traffic ticket and asked Cooks to step out of the car. I informed him that a K9 had indicated the presence of contraband in the car. I gave him his ticket for speeding. He put his hand in his pocket and I asked him to keep it in view. I asked if I could pat him down to make sure he wasn't armed. He agreed. I patted down the exterior of his jacket and pants pockets, but discovered nothing. I asked him to step back with Officer Neavear while I searched his car.

I opened the rear driver's side door and began to search the car. I heard Officer Neavear say,

| WSIRF-01 | **MA-03-00024** | **01/01/2003** | ☐ APPROVED  BY |
|---|---|---|---|

## E911 COMM CENTER

**MA-03-00024    01/01/2003**

OFFICER: 126    ANTHONY FILLINGHAM

☐ Investigation  ☐ Accident  ☑ Arrests Made  ☐ Suspects

**Incident Report Form**

"Gun!" I turned back towards Officer Neavear and saw him putting handcuffs on Cooks. I assisted him with handcuffing. He told me that Cooks had admitted that there was a gun in the center console. I located the pistol (.380 silver Jennings semi-automatic) in the center console. Also located inside the car were two cannabis seeds and an open bottle of cognac. One seed was located in the passenger seat and the other was on the floorboard of the rear seat passenger. The cognac was beneath the driver's seat and was approximately 2/3 full.

The pistol had a loaded magazine of ball ammunition and a round was in the chamber. The pistol was on safe.

Jail staff informed me that they had discovered a baggie of white rocky substance on Cooks. While placing him in a holding cell, a baseball sized packet fell out of the front of his jacket. Jailer Hoyt confiscated the packet and asked him what it was. Cooks replied, "Crack." I placed the packet into evidence after weighing it at 46.5 grams. There are a large number of rocks inside the baggle that are each individually wrapped.

The jail also turned over $100 in twenty dollar bills to me that Cooks had on him.

After consulting with Sgt. Barker, it was decided to seize the vehicle. Officer Neavear had the vehicle towed to the city impound lot.

I spoke with Cooks, but he refused to answer any questions and stated that he did not want to talk about the drugs. He said, "I've been caught so I don't see any point in talking."

Cooks was processed and lodged on charges of unlawful use of firearm and possession of cocaine between 15 and 100 grams. I also issued Cooks another ticket for illegal transportation of open alcohol by driver.

The pistol, white rocky substance, two cannabis seeds, the video tape of the traffic stop, and the $100 dollars were all placed into evidence.

Supplement by Neavear          mpd104    01/02/2003    mpd106    01/02/2003    N

R/O Neavear,106

On 01/01/03 at 11:15 pm, I assisted Ofc. Fillingham on a traffic stop at Ayerco West.

Ofc. Fillingham requested, based on reasonable suspicion (air freshner, criminal history, nervousness, etc.), that I conduct a free air sniff (walk around) of the vehicle with K-9. While Ofc. Fillingham completed paperwork related to the traffic stop, I deployed the K-9. K-9 "Hondo" alerted on the trunk area, indicating the presence of a narcotic odor in the vehicle. Ofc. Fillingham and I spoke with the driver, Derrick Cooks. Cooks admitted that he and his girlfriend often drive around while smoking marijuana. Cooks stated that he had just smoked marijuana in the car yesterday because of New Years Eve.

Ofc. Fillingham searched Cooks, and I stood with Cooks while Ofc. Fillingham searched the vehicle. Cooks began acting very nervously and mumbled to himself. Cooks then stated that

WSIRF-01    **MA-03-00024    01/01/2003**    ☐ APPROVED BY

App. A, p.9

114

# E911 COMM CENTER

MA-03-00024     01/01/2003

OFFICER: 126     ANTHONY FILLINGHAM

☐ Investigation  ☐ Accident  ☑ Arrests Made  ☐ Suspects

## Incident Report Form

there was a gun in the car. I yelled to Ofc. Fillingham that there was a gun in the car. I pushed Cooks onto the hood of the car, and Ofc. Fillingham assisted me in handcuffing him. I searched Cooks with the intention of recovering other possible weapons, and he was placed in the squad car.

Two marijuana seeds were later found in the car.

R/O

On 01/03/03 at approximately 2:45 p.m. Detective Lenardt and myself field tested the suspected crack cocaine from exhibit #1. I opened the sealed plastic bag that Officer Fillingham placed the bag of suspected crack cocaine in, and removed the suspected crack cocaine. I made a small cut in a corner of the plastic bag containing the suspected cocaine, and removed one small baggie that contained two hard cream colored rocks. I tested a small amount of one of the rocks, and it field tested positive for cocaine. I placed the cocaine, and the plastic bag it was in, back inside the plastic bag Officer Fillingham had it in. I placed those bags inside another clear plastic bag and sealed it. Detective Lenardt and myself initialed the bag.

R/O Anthony Fillingham #126

I identified Derrick Cooks during the traffic stop by obtaining his driver's license from him. The picture on the license matched Cooks' face. I verified that it was a valid driver's license with dispatch.

R/O MASON

On 01/08/03 at approximately 1:30 p.m. I met with Agent Bob Bay at the Macomb Police Department. I released the following exhibits from the Macomb Police Department's evidence room to Agent Bay:

Exhibit #1 - 46.5 rams of white rocky substance
Exhibit #2 - .380 silver Jennings semi-auto handgun, a loaded magazine, and a single bullet
Exhibit #3 - two cannabis seeds
Exhibit #4 - video tape of traffic stop
Exhibit #5 - $100.00 cash (5-20$ bills)

# E911 COMM CENTER

MA-03-00024    01/01/2003

OFFICER: 126    ANTHONY FILLINGHAM

☐ Investigation ☐ Accident ☑ Arrests Made ☐ Suspects

## Incident Report Form

| Supplement | mpd106 | 01/10/2003 | mpd106 | 01/10/2003 | N |
|------------|--------|------------|--------|------------|---|

R/O Neavear,106

On 1/10/03 at 11:00 pm, and after receiving a federal court order, I was able to locate a video recording of the traffic stop. The video tape was recorded by my in car camera, and it mostly shows the passenger side of the stopped vehicle after I arrived on the scene. I secured the tape in evidence.

| R/O | mpd114 | 1/26/2003 | mpd114 | 01/26/2003 | N |
|-----|--------|-----------|--------|------------|---|

On 1/26/03 at approximately 1:50 p.m., the vehicle was released to Hertestine Cooks. The towsheet stated that the vehicle was releaseable and that there was no charge.

WSIRF-01    MA-03-00024    01/01/2003    ☐ APPROVED    App. A, p.11



**U. S. Department of Justice**

*United States Attorney*
*Central District of Illinois*

July 7, 2003

*One Technology Plaza*
*211 Fulton Street, Suite 400*
*Peoria, Illinois 61602*

(309) 671-7050
*FAX (309) 671-7259*

Mr. Robert F. Nemzin
Hickey and Nemzin
2536 South California Ave.
Chicago, Illinois 60608

Re:    **United States v. Derrick Cooks**, Case No. 03-10004

Dear Rob:

Please find enclosed stipulations I am proposing. With these stipulations, I can probably reduce my witnesses from 12 to 5 or 6, with the 3 of the 6 being quite short.

Please note that I have the weight of the crack at 39.3 grams in the first stipulation. The lab report states that the crack is 36.8 grams and an additional 2.5 grams not analyzed. If I were going to call Tranellie Collins, the chemist, at trial, I would have her complete the testing of the final 2.5 grams. Let me know what you think. I just wanted to be up front with you so you did not think I was pulling a fast one.

I look forward to speaking with you as soon as possible about the stipulations so that I can reduce the number of subpoenas that we have to issue.

Also enclosed is the combined notice of expert testimony, witnesses, and exhibits.

Very truly yours,

JAN PAUL MILLER
UNITED STATES ATTORNEY

**GREGGORY R. WALTERS**
Assistant United States Attorney

Enclosures

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
AT PEORIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-10004 |
| | ) | |
| DERRICK COOKS, | ) | |
| | ) | |
| Defendant. | ) | |

## STIPULATIONS OF THE PARTIES

NOW COME the United States of America, by its attorneys, Jan Paul Miller, United States Attorney for the Central District of Illinois, and Greggory R. Walters, Assistant United States Attorney, and the Defendant, Derrick T. Cooks, by his attorney, Robert F. Nemzin, and do hereby agree and stipulate as follows:

(1)    Government Group Exhibit 1 is 39.3 grams of cocaine base (crack) that was tested and weighed by Tranellie Collins, a forensic scientist from the Illinois State Police Forensic Laboratory. A proper chain of custody has been maintained at all times for Government Group Exhibit 1. Government Group Exhibit 1 is admitted into evidence.

(2)    Government Exhibit 1A is the outer packaging that contained Government Exhibit 1 (39.3 grams of cocaine base (crack)) prior to laboratory testing of Group Exhibit 1. A proper chain of custody has been maintained at all times for Government Exhibit 1A. Government Exhibit 1A is admitted into evidence.

(3)    Government Exhibit 2 is a Bryco, Model 38, .380 caliber, semi-automatic pistol distributed by Jennings Firearms. A proper chain of custody has been maintained at all times for Government Exhibit 2. Government Exhibit 2 is admitted into evidence.

(4)     Government Group Exhibit 3 is the magazine clip and ammunition found inside Government Exhibit 2 (the Bryco Model 38, .380 caliber pistol).  Government Group Exhibit 3 is admitted into evidence.  The two expended rounds of ammunition contained in Government Group Exhibit 3 were expended by the Illinois State Police Forensic Laboratory during a test fire of the pistol.

(5)     Government Exhibit 4 is a copy of a videotape made from the dash camera of Officer Fillingham's patrol car.  Government Exhibit 4 is admitted into evidence.

(6)     If called to testify, Christopher N. Kozel, a forensic scientists from the Illinois State Police Forensic Laboratory, would testify that he examined and test fired Government Exhibit 2 (the BrycoModel 38, .380 caliber pistol) and that he found Government Exhibit 2 was able to fire.

(7)     If called to testify, John V. Dierker, a forensic scientist from the Illinois State Police Laboratory, would testify that he examined Government Exhibit 1A (the outer packaging of the cocaine base (crack)) and that he examined Government Exhibit 2 (the firearm) for fingerprints.  He would further testify that he found no fingerprint impressions suitable for comparison.

THERE ARE NO FURTHER STIPULATIONS OF THE PARTIES.

2

App. A, p.14

FOR THE UNITED STATES OF AMERICA:

JAN PAUL MILLER
UNITED STATES ATTORNEY

_____        Date: _____
**GREGGORY R. WALTERS**

FOR THE DEFENDANT, DERRICK T. COOKS:

_____        Date: _____
**ROBERT F. NEMZIN**

_____        Date: _____
**DERRICK T. COOKS**

3



**U. S. Department of Justice**

*United States Attorney*
*Central District of Illinois*

<u>**VIA FACSIMILE**</u>

July 11, 2003

One Technology Plaza
211 Fulton Street, Suite 400                    (309) 671-7050
Peoria, Illinois 61602                      FAX (309) 671-7259

Mr. Robert F. Nemzin
Hickey and Nemzin
2536 South California Ave.
Chicago, Illinois 60608

Re:    <u>**United States v. Derrick Cooks**</u>, Case No. 03-10004

Dear Rob:

Thank you for your and Mr. Cooks' agreeing to the proposed stipulations we faxed to you on July 7, 2003.

Please find enclosed an amended expert disclosure for Officer Tim Moore. Additionally, on the witness disclosure, I have listed an officer Holt. It should state "Lynn Hoyt." You will recall that Hoyt was one of the jailers that searched Mr. Cooks the night of his arrest and recovered the crack cocaine.

We are working on the jury instructions and will forward those to you as soon as they are completed.

Please contact me with any questions.

Very truly yours,

JAN PAUL MILLER
UNITED STATES ATTORNEY

**GREGGORY R. WALTERS**
Assistant United States Attorney

Enclosures

App. A, p.16

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-10004 |
| v. | ) | Honorable Michael M. Mihm |
| | ) | Judge Presiding |
| DERRICK COOKS, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT

I, ROBERT F. NEMZIN, on oath, state as follows:

1.      I am a duly licensed attorney admitted to practice law in the State of Illinois and in the United States District Courts for the Northern and Central Districts of Illinois.

2.      I am a partner in the law firm of Hickey and Nemzin, 2536 South California Avenue, Chicago, Illinois.

3.      I was trial counsel for Derrick Cooks in the case of the United States of America versus Derrick Cooks, 03-10004, a criminal matter in the United States District Court for the Central District of Illinois, Honorable Judge Michael M. Mihm presiding.

4.      Mr. Cooks was charged in the above referenced matter with the offenses of possession of more than five (5) grams of crack cocaine with intent to distribute (Count One) and, during and in relation to a drug trafficking crime, knowingly possessing and carrying a firearm (Count Two).

5.      Prior to being retained by Mr. Cooks, I was a practitioner experienced in the defense of criminal cases. I was employed by the Office of the Cook County Public

Defender from 1978 through 1982, representing indigent defendants charged with violations of Illinois state criminal law in Cook County, Illinois. During my tenure as an assistant public defender, I represented many defendants charged with misdemeanor offenses and later, those charged with felony offenses. During that time, I tried numerous misdemeanor bench trials, conducted hundreds of preliminary hearings, and litigated many pre-trial motions, including motions to suppress evidence and motions to suppress statements. In addition, I estimate that I tried over fifty (50) felony bench trials and in excess of fifteen (15) jury trials to verdict. After leaving the public defender's office, I went into private practice with the Law Offices of Stuart V. Goldberg in Chicago, Illinois, where I was an associate concentrating exclusively in the practice of criminal defense. I remained an associate for approximately ten (10) years before becoming an equal partner in the firm of Goldberg, Hickey and Nemzin in 1992. Approximately two (2) years later, I formed my current partnership, Law Offices of Hickey and Nemzin, with attorney Peter J. Hickey, III. Our firm has and continues to engage exclusively in the practice of criminal defense.

Since entering the private practice of law in 1982, I have continued to litigate motions, misdemeanor trials and felony trials, both bench and jury. I am unable to estimate the number of such motions and trials but it is in excess of one hundred (100). My trial experience includes approximately five (5) federal jury trials prior to the instant trial, all held in the Northern District of Illinois.

6.     After having been retained to represent Mr. Cooks in this matter, I reviewed all discovery materials pertinent to the case which were provided by the government.

7. After review of the discovery materials, including a video tape of the encounter between Mr. Cooks and the police, it was my professional opinion that the government could establish, beyond a reasonable doubt, Mr. Cooks' possession of the contraband (controlled substances and firearm) and that evidence of his possession was overwhelming.

8. I discussed my evaluation of the discovery materials with Mr. Cooks and I advised him that in my opinion, the best course of defending the matter was to file and litigate a motion to suppress seeking to have the contraband suppressed from introduction into evidence at a subsequent trial. Mr. Cooks agreed with that course of action.

9. A suppression motion was filed on behalf of Mr. Cooks and after an evidentiary hearing, the motion was denied.

10. After denial of the suppression motion, I consulted with Mr. Cooks as to his options for proceeding further, to wit: either proceed to trial or consider entry of a plea of guilty. During those discussions, it was made clear by me to Mr. Cooks that he was facing a mandatory minimum sentence of ten (10) years imprisonment if convicted of Count One charging possession of cocaine base with intent to distribute and a consecutive mandatory sentence of five (5) years imprisonment for possession of the weapon if convicted of Count Two. It was also discussed that the only way to attempt to receive a sentence below the mandatory minimum sentences was to enter a cooperation plea agreement with the government.

11. After being made aware of his options, Mr. Cooks advised me that he wished to proceed to trial and did not want to enter into a cooperation plea agreement. Having made that decision, we then discussed the theory of defense to be advanced at his

trial.   Having determined that evidence of his possession of the contraband was overwhelming and could not be disputed, it was then agreed upon by me and Mr. Cooks that the only viable defense to be offered was that he was guilty only of simple possession of the controlled substance, not possession with intent to distribute.  It was stated to him by me that if he could prevail in that regard, he would then have to be found not guilty as a matter of law of the gun charge, it not having been proven that the gun was used in relation to a narcotics trafficking offense.

12.    It was also agreed upon, after discussion between me and Mr. Cooks, that as a matter of trial strategy, a stipulation would be entered at trial as to the nature of the controlled substance and the amount seized from Mr. Cooks' in the jail after it fell from his jacket, to wit:  that the substance was cocaine base in the amount 39.3 grams.  This stipulation was entered at trial after my review of the discovery materials, including the police reports which referred to the substance as crack cocaine and the laboratory report prepared by the Division of Forensic Sciences, Illinois State Police Department, which contained a finding by Tramellie Collins, a forensic scientist, that the substance was indeed cocaine base.

13.    During discussions between myself and Mr. Cooks prior to his trial, Mr. Cooks neither disputed the fact that the substance seized was crack cocaine nor requested that an independent analysis of the substance be conducted to determine otherwise.

14.    Likewise, after trial but prior to sentencing and the compilation of the pre-sentence report, Mr. Cooks never raised a question regarding the nature of the substance seized by the police.

FURTHER SAYETH AFFIANT NOT.

ROBERT F. NEMZIN

SUBSCRIBED AND SWORN TO
Before me this 31st day of May, 2007.

NOTARY PUBLIC

OFFICIAL SEAL
SUSAN SANDERS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4-9-2011

APPENDIX B TO THE GOVERNMENT'S RESPONSE TO
PETITIONER'S § 2255 MOTION


EXCERPTS FROM TRIAL TRANSCRIPT

1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

2

3

UNITED STATES OF AMERICA,           )

4                                   )
                    Plaintiff,      ) Criminal No.

5                                   ) 03-10004
            vs.                     ) Peoria, Illinois

6                                   ) July 21, 2003
DERRICK COOKS,                      )

7                                   )
                    Defendant.      )

8

9

JURY TRIAL PROCEEDINGS

10                   VOLUME 1 OF 2

11                    BEFORE:

12            HONORABLE MICHAEL M. MIHM
            United States District Judge

13

14                  APPEARANCES:

15             GREGGORY WALTERS, ESQ.
               BRADLEY MURPHY, ESQ.

16          Assistant United States Attorneys
              200 Fulton Street, Suite 400

17              Peoria, Illinois  61602
          (Appeared on Behalf of the Government)

18

19               ROBERT NEMZEN, ESQ.
              2536 S. California Avenue

20             Chicago, Illinois  60608
          (Appeared on Behalf of the Defendant)

21

22

23               Karen S. Hanna, C.S.R.
              U.S. District Court Reporter

24              Central District of Illinois

25 Proceedings recorded by mechanical stenography, transcript
produced by computer

```
 1                            I N D E X

 2

 3                                                    PAGE

 4

 5   OPENING STATEMENT BY MR. WALTERS              17

 6   OPENING STATEMENT BY MR. NEMZEN              23

 7

 8   WITNESS

 9    ROBERT BAY
        Direct Examination by Mr. Murphy          28
10      Cross Examination by Mr. Nemzen           39
        Re-Direct Examination by Mr. Murphy       50
11      Re-Cross Examination by Mr. Nemzen        53

12    ANTHONY FILLINGHAM
        Direct Examination by Mr. Walters         57
13      Cross Examination by Mr. Nemzen           78
        Re-Direct Examination by Mr. Walters      83
14      Re-Cross Examination by Mr. Nemzen        84

15    KENNETH NEAVEAR
        Direct Examination by Mr. Walters         85
16

17    LYNN HOYT
        Direct Examination by Mr. Freeman         95

18    TIMOTHY MOORE
        Direct Examination by Mr. Murphy         104
19      Cross Examination by Mr. Nemzen          127
        Re-Direct Examination by Mr. Murphy      136
20      Re-Cross Examination by Mr. Nemzen       138
        Further Re-Direct Examination by Mr. Murphy  139
21

22

23

24

25
```

1    arrest.

2          THE COURT:  I don't have any problem with that

3    at all.  We just need to know where he's going to be.  He

4    should check in with probation here today.

5          MR. NEMZEN:  Additionally, Your Honor, there are

6    some other substantive matters I would like to go into if

7    I may.

8          THE COURT:  Go ahead.

9          MR. NEMZEN:  If I may, Your Honor, I just wanted

10   to say after speaking with Mr. Walters, I have made known

11   to him our intent -- our position here is in essence

12   admitting to possession of the contraband, both the weapon

13   and the narcotics, and our theory here is that the State

14   will not be able to meet their burden of proof beyond a

15   reasonable doubt on the two charges before the Court.  I

16   have explained this in great detail to Mr. Cooks.  In

17   effect, we are conceding the issues of possession of both

18   the narcotics and the weapon.  I would ask the Court if

19   you would inquire of Mr. Derrick Cooks that he is

20   conceding to that theory of defense.

21          THE COURT:  May I ask a clarifying question

22   before that?  So you're not -- in terms of Count 1, you're

23   not -- it's your intention not to deny the possession of

24   more than 5 grams of crack cocaine?  You're disputing that

25   it was possessed with the intent to distribute?

9

```
 1              MR. NEMZEN:  That's correct.

 2              THE COURT:  As to the second charge, you're

 3      admitting possession of the firearm, but you're denying

 4      that the possession of the firearm was in relation to

 5      the --

 6              MR. NEMZEN:  Indeed, Your Honor.

 7              THE COURT:  Mr. Cooks, have you heard this

 8      discussion that we've just had here?

 9              MR. COOKS:  Yes, Your Honor.

10              THE COURT:  Has your attorney discussed this in

11      some detail with you?

12              MR. COOKS:  Yes.

13              THE COURT:  Now your attorney of course is an

14      advocate on your behalf and I'm sure he made

15      recommendations to you concerning this, but ultimately

16      this is your decision as to whether or not you wish to

17      admit the possession of the firearm and the possession of

18      the drugs.  Otherwise the burden of course would be on the

19      Government to prove the possession beyond a reasonable

20      doubt.  Do you understand that?

21              MR. COOKS:  Yes.

22              THE COURT:  Is it your decision to admit the

23      possession of the firearm and the drugs as we've just

24      discussed?

25              MR. COOKS:  Yes.
```

1              THE COURT:  All right.  And it is your decision;
2      is that correct?
3              MR. COOKS:  Yes.
4              THE COURT:  Okay.
5              MR. NEMZEN:  Your Honor, may I clarify one
6      matter?  In that regard, I used the term "admit" as it
7      will be throughout our theory of argument and
8      cross-examination.  I do not anticipate that the defendant
9      himself --
10             THE COURT:  I understand.
11             MR. NEMZEN:  May I address the Court on two more
12     matters?  Your Honor, the Court has heard from the
13     evidence at the motion to suppress certain items of
14     evidence, including prior arrest information that the
15     officers received through their communications, also
16     Officer Fillingham's belief he saw a tattoo on the hand of
17     Mr. Cooks that he believed to be a gang tattoo, also the
18     fact that the weapon that was seized was ultimately
19     determined to be a stolen weapon.
20             Ordinarily I would have moved in limine and
21     asked the Court to bar such evidence, but, if I'm correct,
22     Mr. Walters has agreed the State will not make any
23     reference or present any evidence regarding prior arrests,
24     the gang tattoo or the stolen weapon.
25             THE COURT:  Is that correct?

1    possession for distribution.

2          THE COURT:  This language of it being consistent

3    with an amount to be used for distribution is typically

4    the language that's used here.  I don't think --

5          MR. MURPHY:  Any questions will be framed as

6    such, is it consistent with an intent to distribute and is

7    it consistent or inconsistent with personal use.  Those

8    will be the types of questions I will be asking, Judge.

9          THE COURT:  Fine.

10          MR. NEMZEN:  Thank you, Your Honor.

11          THE COURT:  Yes?

12          MR. WALTERS:  Just briefly, Your Honor.  I

13    tender to the Court stipulations of the parties signed by

14    counsel and Mr. Cooks.

15          THE COURT:  Let me take a minute and look at

16    this.  This document entitled "Stipulations" contains

17    seven numbered paragraphs that set out various

18    stipulations concerning physical evidence and what expert

19    witnesses would testify to if they were called to testify.

20    Are these matters that you have carefully discussed with

21    your client?

22          MR. NEMZEN:  Yes, Your Honor, indeed, and he has

23    signed off on that as well after reviewing it and speaking

24    with me.

25          THE COURT:  All right.  Is that correct,

1    Mr. Cooks?  Have you discussed each of these items

2    separately?

3         MR. COOKS:  Yes, Your Honor.

4         THE COURT:  And, again, you understand that you

5    certainly can, as it appears you have done here, stipulate

6    to the admission of these so these matters do not have to

7    be formally presented during trial, but you certainly have

8    the right to hold the Government to their burden of proof

9    and require that they present evidence on each of these

10    matters, for example including as to the drugs or the

11    firearm chain of custody, things like that.  Have you

12    discussed those matters with your attorney?

13         MR. COOKS:  Yes, Your Honor.

14         THE COURT:  Is it your decision, as he has just

15    announced and you've reflected by signing this document,

16    is it your decision to stipulate to those matters?

17         MR. COOKS:  Yes, Your Honor.

18         THE COURT:  Okay.  What else?  Anything?

19         MR. MURPHY:  I have two other brief matters,

20    Your Honor.  Mr. Aaron Freeman is a law student.  He has

21    been admitted to practice under the supervision of an

22    attorney by Judge McDade, has appeared in a couple of

23    sentencing hearings to this point, and we are going to be

24    asking him to do the direct examination of one of our

25    witnesses.  I wanted the Court to understand that under

1    intent to distribute?  Listen to the officers as they take

2    the stand and describe to you the 27 -- or the multiple

3    baggies of crack cocaine found on the defendant's person.

4    Listen to how much it weighs.  Listen to how it's

5    packaged.  Listen to the expert testimony that the

6    Government will offer through Officer Tim Moore of the

7    Peoria Police Department as he testifies and tells you

8    that based on the weight of this crack cocaine, the way

9    it's packaged, the fact that there is a handgun loaded in

10   the car with one round chambered, that it is consistent

11   with the intent to distribute crack cocaine and

12   inconsistent, ladies and gentlemen, with personal use.

13         At the end of this case, we'll have an

14   opportunity to give what's called our closing argument and

15   at that time we will submit to you that the only verdicts

16   supported by the evidence in this case is a verdict of

17   guilty on Count 1 and a verdict of guilty on Count 2 of

18   the indictment and we will, therefore, ask you to find the

19   defendant guilty of both counts.  Thank you.

20         THE COURT:  Thank you, Mr. Walters.  Mr. Nemzen?

21                    **OPENING STATEMENT**

22                    **BY MR. NEMZEN**

23         If it please the Court, ladies and gentlemen,

24   Mr. Cooks.  Trials are all about disputes.  Whether it be

25   a case of he said/she said, it's usually the facts, what

1    occurred, what happened that's in dispute.  In this case,

2    there is no such dispute.  There is no question that the

3    facts happened as Mr. Walters said.  Derrick Cooks has no

4    quarrel with the facts.  On January 1, 2003, he indeed

5    possessed drugs and indeed he possessed a firearm and the

6    drugs were in his pants, the firearm in his car.

7         But there is a dispute in this case, ladies and

8    gentlemen, and that dispute is whether or not the State

9    can prove beyond a reasonable doubt that when he possessed

10   those drugs he did so with the intent to distribute and

11   whether when he possessed that firearm the Government can

12   prove beyond a reasonable doubt that he did so during or

13   in relation to the offense of possession of a controlled

14   substance with intent to deliver.

15        I would like to take this opportunity to

16   introduce myself personally.  My name is Bob Nemzen.  It's

17   my privilege to be here on behalf of Derrick Cooks.  Now,

18   indeed, Mr. Walters was quite eloquent in his opening

19   remarks, and I had no doubt that he would be, but, as

20   Judge Mihm instructed you earlier, what Mr. Walters said

21   is not the evidence.  The evidence comes from the witness

22   stand through the testimony of the witnesses, it comes

23   from the physical exhibits, the evidence itself that's

24   introduced, and it comes from the stipulations of the

25   parties.  The evidence -- rather the facts are not the

1    words of Mr. Walters.  The facts are what you determine

2    them to be and, most importantly, inferences, reasonable

3    inferences, that can be drawn from facts are to be drawn

4    by you.  You are the finders of fact, the triers of fact.

5    Now it's going to be your call what the facts are and what

6    the reasonable inferences that can be made from those

7    facts are.

8         Derrick Cooks has pled not guilty.  He says the

9    Government cannot prove beyond a reasonable doubt each and

10   every element of the charges of possession of a controlled

11   substance with intent to deliver and possession of a

12   firearm during or in relation to a drug trafficking

13   offense.

14        Now I think you all saw during the voir dire

15   selection that it's not the most exciting thing that makes

16   for a courtroom drama, but it wasn't without a purpose and

17   it wasn't without its importance and the purpose was to

18   select you, a fair and impartial jury.  The jury is the

19   cornerstone of the American criminal justice system.  And

20   I know that I was listening hard to the answers that each

21   and every one of you gave, you might have seen me taking

22   some notes, because I listened intently as each of you

23   made the same assurances to the United States of America

24   through their representatives and to Derrick Cooks,

25   assurances, promises if you will, that you would abide by

 1   under your oath as jurors.

 2          Now what are some of those promises?  Well,

 3   first of all, each and every one of you promised, assured

 4   everybody, that you would try this case in a fair and

 5   impartial manner, that you wouldn't be guided by any bias,

 6   any sympathy, any prejudice, and that you would decide

 7   this case not on speculation, not on gut feeling, not on

 8   conjecture, but evidence and that your decision would be

 9   based on the evidence alone and reasonable inferences.

10   You would try the case in a fair and impartial manner.

11          Importantly, you promised that you would hold

12   the United States Government to their burden of proof.

13   And this case is all about the burden of proof and the

14   burden of proof rests right here right now with the

15   Government, the United States of America vs. Derrick

16   Cooks.  As he sits here now, Derrick Cooks is an innocent

17   man.  He's innocent of the charges in Count 1 that he

18   possessed a controlled substance with intent to deliver,

19   and he is innocent as he sits there now of Count 2,

20   possessing the firearm during or in relation to possession

21   with intent to deliver cocaine.  He's presumed innocent

22   now, he's presumed innocent as he sits there throughout

23   this trial, and he is presumed innocent as he sits there

24   throughout your deliberation.  The burden never shifts.

25   He needn't testify.  He needn't call any witnesses.  And

1    that's because the burden is here all the way unless and

2    until you find that the Government has presented you

3    evidence that establishes each and every element of the

4    offenses charged beyond a reasonable doubt.  And the

5    burden of proof -- the burden of proof is proof beyond a

6    reasonable doubt.

7          I would be remiss if I didn't mention one more

8    promise, and that's the promise that Mr. Walters just made

9    in his opening remarks when he said to you that we gladly

10   assume and don't shy away from the burden.  He has

11   promised you he would deliver to you the evidence that's

12   sufficient to convict, the proof beyond a reasonable

13   doubt.

14         When I get up here at the conclusion of the case

15   and before your deliberations, I'm going to call on you on

16   behalf of Mr. Cooks to abide by the promises that you

17   made, each and every one of you, those assurances, and

18   when I call upon you to do that I will simply ask that you

19   call upon the Government to meet their burden, to meet

20   their promise, and I'm hopeful when all the evidence is

21   in, when you have been instructed on the law, when closing

22   arguments have been made, you will go back into that jury

23   room and you will abide by the promises you made and you

24   will tell the Government, the United States Government,

25   that they haven't kept their promise.  Thank you.

1              THE COURT:  Thank you, Mr. Nemzen.  Call your

2     first witness, please.

3              MR. MURPHY:  I call Inspector Bob Bay.

4                           **ROBERT BAY,**

5     Having been first duly sworn, was examined and

6     testified under oath as follows:

7                      **DIRECT EXAMINATION**

8     BY MR. MURPHY:

9     Q     Sir, would you please state your name and spell your

10    last name?

11    A     Inspector Robert Bay, B-A-Y.

12    Q     What's your occupation, please?

13    A     Police officer.

14    Q     How long have you been a police officer?

15    A     Over 23 years.

16    Q     For what department have you worked, sir?

17    A     I work for Western Illinois University Police

18    Department, presently attached to the West Central

19    Illinois Task Force.

20    Q     How long have you been with that task force and where

21    is it located?

22    A     I have been with it five years and it's in Macomb,

23    Illinois.

24    Q     What are the nature of your duties, please, with the

25    task force?

1    A    Drug enforcement in general, purchases, that type of

2    stuff, undercover buys.

3    Q    Do you yourself make undercover buys from time to

4    time?

5    A    Yes.

6    Q    Do you supervise other individuals from time to time

7    who do make undercover buys?

8    A    Correct.

9    Q    Do you also have certain duties with regard to both

10    processing and the chain of evidence that you receive?

11    A    Yes.

12    Q    Inspector Bay, lying just to your right now are a

13    group of exhibits that I want to talk to you about,

14    please.  The first is Group Exhibit 1.  Would you take a

15    look at that one, please?  Do you see any of your own

16    identifying marks on that exhibit by which you recognize

17    it?

18    A    Yes, I do.

19    Q    What do you observe, sir?

20    A    It's my packaging from the Illinois State Police.

21    Q    Do you recall on the date of January 8 how you first

22    saw that, please?

23    A    Yes.  I obtained this evidence at the Macomb Police

24    Department.

25    Q    And what was your purpose in taking the evidence or

1     obtaining control of it?

2     A     For federal prosecution.

3     Q     And what did you do in terms of processing the

4     evidence that you received that day with regard to Group

5     Exhibit 1?

6     A     This one, I took it as evidence and placed it in

7     temporary evidence locker, and then on 1-9 of '03 I

8     transported it to the Morton lab in Morton, Illinois.

9     Q     I need for you at this time to describe the exhibit

10    that you saw when you first received it.

11    A     When I first saw this exhibit, it had two baggies or

12    a bunch of -- or 27 individually wrapped, and they were

13    tied in a knot, what I would consider baggies.

14    Q     And were there contents inside the bags that had the

15    little knots?

16    A     Yes.

17    Q     What did that appear to be?

18    A     It appeared to be crack cocaine.

19    Q     Now you have had experience with crack cocaine in

20    your duties?

21    A     Yes.

22    Q     You know there are different types of cocaine, and in

23    fact different types of cocaine base, but this was crack?

24    A     Correct.

25    Q     Now how many other bags were there at the time you

1    questions, Judge.

2             THE COURT:  Any objection?

3             MR. NEMZEN:  No objection.

4             THE COURT:  Thank you.  They are admitted.

5                    **CROSS EXAMINATION**

6    BY MR. NEMZEN:

7    Q    It's Inspector Bay?

8    A    Yes.

9    Q    I think you indicated that you were employed with the

10   West Central Task Force?

11   A    West Central Illinois Task Force.

12   Q    And that you're basically a narcotics inspector; is

13   that correct?

14   A    Correct.

15   Q    And the task force focuses exclusively on drug

16   interdiction?

17   A    Correct.

18   Q    By that, I mean to say you're there to ferret out,

19   seek out narcotics trafficking and narcotics users?

20   A    Correct.

21   Q    Now Mr. Murphy asked you if you work in the capacity

22   of making purchases undercover.  Do you do that?

23   A    Yes.

24   Q    So you will be dressed as a civilian, someone seeking

25   to buy narcotics, looking for those people selling their

1   wares; is that correct?

2   A   Correct.

3   Q   You also indicated that you supervise others?

4   A   Yes.

5   Q   Would that be other police officers that do the same

6   thing?

7   A   Correct.

8   Q   So when an officer such as yourself or other officers

9   act in that capacity, those are considered undercover

10  purchases; is that right?

11  A   That's correct.

12  Q   You also use informants, do you not?

13  A   Yes.

14  Q   Those are civilians who might have been caught up in

15  some problems and wish to provide information to you to

16  use against other people who are selling drugs; is that

17  right?

18  A   Correct.

19  Q   Would it be fair to say you have informants in and

20  about the Macomb area?

21  A   Yes.

22  Q   Lots of informants?

23  A   Maybe not lots.

24  Q   A few?  More than a few?

25  A   Yes.

41

1    Q    Now Macomb is not a very big city, is it?

2    A    No.

3    Q    But there is some drug trafficking there?

4    A    Yes.

5    Q    You're familiar with that?

6    A    Yes.

7    Q    As best you can be?

8    A    Yes.

9    Q    A lot of the information you glean is from these

10   informants?

11   A    Correct.

12   Q    Now in addition to working undercover and making

13   purchases, you also do surveillance, do you not?

14   A    Yes.

15   Q    When I say "surveillance", you might in your official

16   capacity as a police officer receive information and,

17   acting upon that information, look for somebody or watch

18   somebody?

19   A    Correct.

20   Q    Surveil them?

21   A    Correct.

22   Q    Keeping tabs on their activities?

23   A    Right.

24   Q    Often times the information you rely on and the

25   information that you obtain from your surveillance is

1    enough to obtain a search warrant; is that right?

2    A    In some cases.

3    Q    You participated in investigations which have led to

4    the issuance of search warrants?

5    A    Yes.

6    Q    Now in this particular case, I think you said you

7    came about this evidence on January 8 because you were

8    gathering it for a federal prosecution; is that right?

9    A    Correct.

10   Q    But at that time it was determined that the case was

11   going to be prosecuted by the U.S. Attorney's Office here

12   in the Central District?

13   A    I believe before that it was.

14   Q    You were then called in because you work with the

15   Government on these cases?

16   A    No.  I initially made the contact with DEA on this.

17   Q    You, of course, reviewed reports that were prepared

18   by the officers in this case?

19   A    Correct.

20   Q    And sometime prior to January 6 of this year, a

21   complaint and an arrest warrant was issued for Derrick

22   Cooks in the federal prosecution; is that right?

23   A    Correct.

24   Q    The complaint charged him with an offense, did it

25   not?

1    A     Yes.

2    Q     That charged him with the offense of possessing crack

3    cocaine, right?

4    A     I believe that's what it was.

5    Q     With intent to distribute?

6    A     Right.

7    Q     And you then had that complaint and arrest warrant

8    and you went out to serve that arrest warrant, did you

9    not?

10   A     Correct.

11   Q     That would have been on January 6, just days after he

12   was arrested; is that correct?

13   A     Correct.

14   Q     You went to the address that had been provided to you

15   regarding Mr. Cooks' home residence?

16   A     Right.

17   Q     And you went out there with the arrest warrant and

18   the complaint?

19   A     Correct.

20   Q     You didn't contact Mr. Cooks prior to this, did you?

21   A     No.

22   Q     You went out unannounced?

23   A     Correct.

24   Q     When you reached his address, which would have been

25   on Shannon Drive, 204 North Shannon Drive, Apartment 2 in

1   Macomb, he was there, wasn't he?

2   A   Yes.

3   Q   You went there?  You knocked on the door?

4   A   Yes.

5   Q   You saw Derrick Cooks?

6   A   Yes.

7   Q   You served him with the warrant?

8   A   Correct.

9   Q   You were there in relation to serving a warrant for

10  the offense of possession of a controlled substance with

11  intent to deliver; is that right?

12  A   Correct.

13  Q   Knowing that, and in addition based upon your

14  experience regarding people who are engaged in

15  trafficking, selling drugs, you went there with another

16  purpose in mind, did you not?

17  A   I went there to talk to Mr. Cooks to find out if he

18  would allow us to search, yes.

19  Q   So you did go, keeping in mind that it would be your

20  intent to seek to search his residence; is that right?

21  A   Yes.

22  Q   You didn't have a warrant --

23  A   No.

24  Q   -- for a search?

25  A   Right.

1    Q    But you did ask for his permission?

2    A    Correct.

3    Q    For his consent because with his consent, you

4    wouldn't need a warrant to search?

5    A    Yes.

6    Q    In fact, he did cooperate and gave his consent?

7    A    Yes.

8    Q    You went there in the company of two other officers;

9    is that correct.

10   A    Yes.

11   Q    So there were three law enforcement personnel on

12   hand?

13   A    Correct.

14   Q    Now you were searching -- you were searching for

15   additional drugs, were you not?

16   A    Correct.

17   Q    And other indicia of distribution?  Is that fair to

18   say?

19   A    Yes.

20   Q    As well as weapons?

21   A    Uh-huh.

22   Q    Now some of the things you can be looking for would

23   maybe be fairly small items, is that correct?

24   A    Yes.

25   Q    So would it be fair to say that your search of the

46

1    residence which did follow his consent, your search of the

2    residence was a rather thorough search?

3    A    Yes.

4    Q    You searched all the rooms of the apartment?

5    A    Yes.

6    Q    An exhaustive search?

7    A    I'm sorry?

8    Q    An exhaustive search?  As much as you could search,

9    you did?

10    A    Yes.

11    Q    And the two other officers on the scene, they also

12    engaged in the search as well, did they not?

13    A    I believe one other officer did.  The other one was

14    watching Mr. Cooks.

15    Q    Now how big was that apartment, if you can recall?

16    A    It wasn't very big.

17    Q    Did you search all the rooms of it?

18    A    Yes.

19    Q    Now you have indicated you went there and obviously

20    one of your purposes was to search for drugs and weapons?

21    A    Correct.

22    Q    Any additional drugs and weapons and also for indicia

23    of someone distributing narcotics?

24    A    Correct.

25    Q    Would you tell the ladies and gentlemen of the jury,

47

1    did you find any scales in the apartment?

2    A    No.

3    Q    Any kind of electronic or triple beam or digital

4    scales?

5    A    No.

6    Q    Did you find any type of mix which would adulterate

7    any kind of drugs if someone is engaged in the sale, if

8    somebody adulterated drugs with a mix, a non-contraband?

9    A    No.

10    Q    Did you find any kind of mix or cut?

11    A    No.

12    Q    Now knowing that the arrest warrant and the complaint

13    was for possession of a controlled substance, you were

14    looking for these things, were you not?

15    A    Correct.

16    Q    And did you find -- strike that.  In your experience

17    as a police officer, as a drug enforcement officer with

18    the task force, you have come to know that dope dealers

19    often times will have lines of communications with people

20    who they're selling to; is that right?

21    A    Yes.

22    Q    In the form of beepers, pagers, cell phones?

23    A    Right.

24    Q    You were looking for items such as that as well?

25    A    Yes.

1   Q    Tell the ladies and gentlemen of the jury, did you

2   find any beepers?

3   A    No.

4   Q    Did you find any cell phones?

5   A    Cell phone I'm not sure.

6   Q    If you did, you would have inventoried that as you

7   did any other evidence?  Is there anything that would

8   refresh your recollection whether you found any cell

9   phone?

10  A    I believe we didn't find a cell phone there.

11  Q    Any kind of pagers?

12  A    No.

13  Q    Now are you familiar with a heat sealing machine?

14  A    Yes.

15  Q    That would be when someone is selling goods in a

16  plastic bag, there's a machine like what's commonly

17  referred to as a seal-a-meal?

18  A    Right.

19  Q    Did you find anything like that in the apartment?

20  A    No.

21  Q    Currency?  Drug dealers, I'm sure you've come to

22  know, might often have large amounts of cash?

23  A    Correct.

24  Q    In your search of the apartment that day, January 6,

25  you were looking for money as well, were you not?

1    A    Yes.

2    Q    Would you tell the ladies and gentlemen, do you know

3    how much you found?

4    A    We didn't find any.

5    Q    Now sophisticated drug dealers, big drug dealers, any

6    drug dealers, they may have security systems in their

7    house?

8    A    Yes.

9    Q    Was there any type of security system in the

10    apartment on Shannon Drive?

11    A    No.

12    Q    No weapons were found there?

13    A    No.

14    Q    And we were talking about seal-a-meals, heat sealers.

15    That would be commonly used, as you said, to seal packages

16    containing drugs and those packages are often clear

17    plastic bags or foil?

18    A    Not so much foil, but sealed plastic bags.

19    Q    Would you tell us, did you find any empty plastic

20    bags or any packaging material in the apartment during

21    your search that day?

22    A    No, I did not.

23    Q    Ledgers? Any kind of ledgers or records indicating

24    what, if any, customers Mr. Cooks was dealing with?

25    A    No, we didn't find any.

1    Q    Now this was all part of your investigation in the

2    case of the United States vs. Derrick Cooks; is that

3    right?

4    A    Yes.

5    Q    And did you go to any of your informants, any of your

6    sources, and ask them about Derrick Cooks?

7    A    We hadn't had any information on Derrick.

8    Q    None at all?

9    A    No.

10    Q    Would you pride yourself in taking note of what goes

11    on in the drug world in Macomb?

12    A    As best I can.

13         MR. NEMZEN:  That's all I have, Your Honor.

14         THE COURT:  Thank you.  Re-direct?

15         MR. MURPHY:  Just a few questions please, Judge.

16                   **RE-DIRECT EXAMINATION**

17    BY MR. MURPHY:

18    Q    Mr. Cooks was arrested on the 1st of January?

19    A    Correct.

20    Q    And he was not in custody, he was at his home, on the

21    6th of January?

22    A    Yes.

23    Q    During the course of your search of his apartment,

24    did you find any pipes or paraphernalia that you would

25    associate with the use of drugs?

1    stipulations now.  Is that agreeable?

2        MR. NEMZEN:  No objection.

3        THE COURT:  Okay.  I told you during my

4    preliminary instructions that evidence could be presented

5    to you by way of stipulation.  A stipulation is something

6    upon which the parties agree and very often stipulations

7    are used as a way of saving time and resources.  If there

8    is no dispute, there's no reason to call certain witnesses

9    to prove the particular item.  In this case the parties

10   have entered into certain stipulations and I'm going to

11   read those to you now and you should consider these in the

12   same way that you would any other evidence.

13        Now come the United States of America, by its

14   attorneys, Jan Paul Miller, U.S. Attorney for this

15   District, and Greggory R. Walters, Assistant U.S.

16   Attorney, and Derrick T. Cooks, by his attorney, Robert F.

17   Nemzen, and hereby agree and stipulate as follows:

18        One:  Government Group Exhibit 1 is 39.3 grams

19   of cocaine base, that is crack cocaine, that was tested

20   and weighed by Tranellie Collins, a forensic scientist

21   from the Illinois State Police Forensic Laboratory.  A

22   proper chain of custody has been maintained at all times

23   for Government Group Exhibit 1.  Government Group

24   Exhibit 1 is admitted into evidence.

25        Two:  Government Exhibit 1A is the outer

1   Q    How long have you been a police officer with the City

2   of Macomb?

3   A    About 8 1/2 years.

4   Q    Prior to working for the City of Macomb as a police

5   officer, did you have any law enforcement experience?

6   A    Yes, I did.

7   Q    What is that experience?

8   A    I worked part-time as an auxilliary police officer

9   for approximately two years before that.

10  Q    I want to direct your attention to the night of

11  January 1, 2003 at approximately 11:15 p.m.  Where were

12  you?

13  A    I was working in the City of Macomb.

14  Q    What shift do you work?

15  A    Third shift.

16  Q    What are the hours of that shift?

17  A    10:30 p.m. until 6:30 a.m.

18  Q    What, if anything, occurred at approximately 11:15

19  p.m. that night?

20  A    I saw a car speeding 40 miles per hour in a 30-mile

21  per hour speed zone.

22  Q    What did you do?

23  A    I reversed direction so I was following the car,

24  turned on my emergency lights and stopped it.

25  Q    Where is this car -- or strike that.  What street

1    were you on?

2    A    I was on West Jackson Street.

3    Q    Where was the car?

4    A    The car ended up stopping in the parking lot of one

5    of our gas stations, Ayerco West, at 315 West Jackson.

6    Q    What direction was the car driving?

7    A    The car had been driving eastbound.

8    Q    What did you do when you made the traffic stop?

9    A    I called in my information to my dispatch center and

10   then got out of my squad car to approach the car that I

11   had stopped.

12   Q    Tell the ladies and gentlemen of the jury what you

13   did next.

14   A    I walked up to the car and asked the driver for his

15   driver's license, proof of insurance.  He began giving me

16   the documents.  I asked him where he was going and he said

17   that he was going home, that he had just got off work from

18   Wal-Mart.  That didn't make sense to me because he had

19   been driving away from his home that was on -- that he

20   told me he lived at, so I asked him about that and he said

21   that he had went home and changed his mind and decided he

22   needed to go get gas, so he was actually leaving his home.

23   Q    Let me stop you there.  You're referring to a driver.

24   Is the driver of that vehicle in the courtroom today?

25   A    Yes.

64

1    Q    What happened after that then?

2    A    I asked him to step back with Officer Neavear to my

3    squad car while I began the search of his car.

4    Q    Did you search the defendant's car?

5    A    Yes, I did.  I began to --

6    Q    Where did you begin to search?

7    A    At the left rear door, the driver's side back door in

8    the floorboards.

9    Q    As you were searching, did anything happen?

10   A    As I was searching, suddenly I heard officer

11   Neavear's voice yell or say very loudly, "Gun."  And that

12   automatically directed attention back to him and I saw

13   that he had Mr. Cooks pushed down against the hood of my

14   squad car and was holding him there.  I got up and

15   immediately moved back to Officer Neavear and Mr. Cooks.

16   Q    Why did you move back to Mr. Cooks?

17   A    Because Officer Neavear was trying to handcuff him

18   and I went back to assist him.

19   Q    After you assisted him, what did you do?

20   A    Officer Neavear told me that Mr. Cooks had stated

21   that there was a gun in the car and then further stated

22   that the gun was in the center console between the seats.

23   Q    What did you do after you got that information,

24   Officer?

25   A    I walked back up to the car and I think the driver's

65

1    side door was still open.  I got down on my knees and I

2    looked underneath the seat briefly and then I opened up

3    the center conceal and I saw a silver semi-automatic

4    pistol that was the .380 Jennings.

5    Q    What did you do with that weapon?

6    A    I stepped back out of the car, pulled out some

7    plastic gloves so I wouldn't transfer any of my

8    fingerprints or smudge any fingerprints that might be

9    there, put them on, then I pulled the pistol out.  Officer

10   Neavear got a paper bag and we put the firearm in the

11   paper bag which we sat on the trunk until we finished the

12   search of the car.

13   Q    When you found the weapon, at that time were you able

14   to determine if it was loaded or unloaded?

15   A    I knew there was a magazine in it, but I did not

16   press check the weapon, which would be sliding the slide

17   of the pistol back to see if there was a bullet in the

18   chamber, so I don't know.  I did not know at that point

19   and time whether or not the magazine had any ammunition in

20   it or whether or not there was a round in the chamber.

21   Q    After recovering the weapon, what did you do?

22   A    Completed the search of the vehicle.

23   Q    In completing the search of the vehicle, did you find

24   any other suspected contraband?

25   A    Yes.

1    Q    During your search of the defendant's car on the

2    night of January 1, 2003, did you find any items that

3    would indicate -- or strike that.  Did you find any such

4    drug paraphernalia?

5    A    No.

6    Q    I'm showing you what has been admitted into evidence

7    as Government Exhibits 2 and 3.  First with regard to

8    Government Exhibit 2, would you please tell us what that

9    is?

10   A    Is this Government Exhibit 2?

11   Q    There is -- if you turn it around, there is an

12   exhibit sticker on the handle.

13   A    This is the silver pistol I found in the center

14   console between the driver's and passenger seats.

15   Q    Would you please tell us what Government Exhibit 3

16   is?

17   A    This is the ammunition that was recovered from inside

18   the vehicle -- excuse me -- inside the gun, a single round

19   in the chamber and then a loaded magazine in the pistol

20   itself.

21   Q    On the night of January 1, 2003 or early morning of

22   January 2, did you ever determine whether that gun was

23   loaded?

24   A    Yes, I did.

25   Q    Would you please explain to us when and where that

1    happened?

2    A    That happened at the police department.  It would

3    have been -- I'm not sure I can give you an accurate time

4    frame on when I actually unloaded the weapon.  It was

5    placed into evidence that morning by myself and another

6    police officer.  And before we can put a firearm into

7    evidence, it has to be made safe, completely unloaded, so

8    that the next morning or Monday morning when the

9    investigators come in, they don't open the evidence locker

10   and have to deal with a loaded firearm.  We want the

11   firearm sitting there unloaded.

12            And when I placed it in evidence, I released the

13   magazine and I saw that the magazine was loaded, but I

14   didn't pull any of the bullets out of the magazine, again

15   for evidentiary reasons.  Then I pulled the slide back,

16   which is this top part of the pistol, and that reveals the

17   chamber and there was a round in the chamber and that

18   round came out.

19   Q    Officer Fillingham, during the traffic stop, I

20   believe you testified you had an opportunity to talk to

21   Mr. Cooks?

22   A    Yes.

23   Q    Did you also have the opportunity to observe his

24   physical demeanor?

25   A    Yes.

1    Q    Was there anything unique about his speech that

2    night?

3    A    He was a little nervous, but that's about it.

4    Q    Aside from being nervous was there anything?

5    A    No.

6    Q    How about his physical motor skills?

7    A    No.  He was in control of his body.

8    Q    As a police officer, is there anything from the

9    defendant's actions or words that led you to believe he

10    might have been under the influence of some type of

11    substance?

12    A    No, not at all.

13    Q    Was the defendant arrested that night?

14    A    Yes, he was.

15    Q    After he was arrested, did you receive a telephone

16    call or some type of communication from the McDonough

17    County jail?

18    A    Yes, I did.

19    Q    Would you please describe for the ladies and

20    gentlemen what occurred with that call?

21    A    The jail staff informed me that they had recovered

22    some contraband from Mr. Cooks in the jail, so I went to

23    the jail to meet with the two jailers that were on duty.

24    Q    Do you remember who those jailers were?

25    A    Jail Officer Lynn Hoyt, Jail Officer Pat Waddell.

1    case.  15 minutes.

2                             (Recess taken)

3         (Following held out of the presence of the jury)

4               THE COURT:  Mr. Nemzen, are you going to use the

5    tape?

6               MR. NEMZEN:  I am not.

7               MR. WALTERS:  Since the dog thing came up, I was

8    going to do a small segment on that with Officer Neavear

9    to explain that.

10              THE COURT:  Do you have that --

11              MR. WALTERS:  It's queued up and ready to go at

12   that point.

13              THE COURT:  Are you going to do that with the

14   next witness?

15              MR. WALTERS:  Yes, Your Honor.

16              THE COURT:  All right.  Let's go.  Bring the

17   jury down.

18         (Following held in the presence of the jury)

19              THE COURT:  Mr. Nemzen?

20                        **CROSS EXAMINATION**

21   BY MR. NEMZEN:

22   Q    Officer Fillingham, I know you said that you were --

23   you had been on the Macomb Police Department for a few

24   years; is that right?

25   A    Yes, sir.

1    Q    Prior to that you worked in other jurisdictions as a

2    police officer?

3    A    That's correct.

4    Q    In your duties as a Macomb police officer, you have

5    participated in other narcotics cases?

6    A    Yes, I have.

7    Q    Cases involving sales of narcotics?

8    A    That's correct.

9    Q    Cases involving people who are using?

10   A    Yes.

11   Q    Now you have indicated -- I believe Mr. Walters asked

12   you if you were familiar with the manner and way in which

13   users ingest crack cocaine?

14   A    Yes.

15   Q    You indicated you were familiar?

16   A    Yes.

17   Q    That they do so by means of pipes or other exotic

18   bongs, etcetera?

19   A    Yes.

20   Q    You found none of that, however, present in the car?

21   A    Yes.

22   Q    By the way, the search of the car as we could see was

23   rather thorough?

24   A    Yes.

25   Q    You also searched the trunk at some point and time?

1    A    Yes.

2    Q    By the way, you testified that a couple of marijuana

3    seeds were found in the trunk?

4    A    Yes.

5    Q    By the way, would that indicate to you that maybe

6    somebody was rolling a marijuana cigarette in the car and

7    two seeds had gone astray?

8    A    That would seem to be quite possible.

9    Q    Now, again, you said you were familiar with how users

10   ingest cocaine, right?

11   A    In this specific situation, crack.

12   Q    Now you are also familiar with what tools of the

13   trade sellers might have, are you not?

14   A    Yes.

15   Q    Based upon your experience as a Macomb police officer

16   and having been involved in narcotics cases, right?

17   A    Yes.

18   Q    During the course of that search, did you seize any

19   pagers or beepers from the car or from the person of

20   Mr. Cooks?

21   A    No pagers, no beepers.

22   Q    In your experience as a Macomb police officer -- I

23   want you to speak from your experience -- is it common for

24   drug dealers to have a line of communication with their

25   would-be customers?

1    A    Usually a cell phone at this day and age.

2    Q    Did you find a cell phone in the car that night?

3    A    I don't believe so.

4    Q    And do they also communicate by way of pagers or

5    beepers?

6    A    Yes.

7    Q    And you indicated you did not find any pagers or

8    beepers?

9    A    No.

10    Q    Or a cell phone?

11    A    That's correct.

12    Q    Now you found about a hundred bucks on him?

13    A    Yes.

14    Q    No large amounts of cash were found in the car; is

15    that right?

16    A    No.

17    Q    I know you said you found no pipes.  You didn't find

18    any packaging material in the car as well, did you?

19    A    With the exception of the packaging material that the

20    contraband was found in, no.

21    Q    You didn't find any empty plastic bags or any

22    portable scales?

23    A    No.

24    Q    You've seen those small portable scales that you can

25    hand weigh, right?

```
 1    A    Yes.

 2    Q    You didn't find any of those things?

 3    A    No.

 4    Q    Now you talked about a conversation you had with

 5    Officer Neavear when he yelled to you "gun"?

 6    A    Yes.

 7    Q    You also talked about other conversations with

 8    Neavear where you requested the dog alert; is that true?

 9    A    Yes.

10    Q    You also spoke to him -- you also spoke to Mr. Cooks

11    in the presence of Officer Neavear where you had a

12    conversation with him regarding marijuana; is that right?

13    A    Yes.

14    Q    By the way, the dog Hondo, in your presence he

15    alerted to the odor of cannabis, did he not?

16    A    I'm not sure whether I could say he alerted to the

17    cannabis or to the crack cocaine.  I'm really not certain

18    which one he alerted to.  That would be a question that

19    Officer Neavear would be better able to answer.

20    Q    But he did alert?  The dog did alert to something?

21    A    Yes.

22    Q    And then there was a conversation either right before

23    that or right after that in the presence of Officer

24    Neavear that you had with Mr. Cooks?

25    A    Yes.
```

1   Q    And that was when he told you that he often drives

2   around smoking marijuana in the car; isn't that right?

3   A    That's correct.

4   Q    In fact, just the day before he and his lady friend

5   had been smoking marijuana in the car?

6   A    That's correct.

7   Q    So that he had been using it, had he not, according

8   to his statement?

9   A    According to his statement, yes.

10  Q    Now by the way, in Macomb or any other jurisdiction

11  where you've lived, is it ever common on New Year's eve

12  for any gunshots to be fired?

13  A    Rarely.

14  Q    Have you ever heard of that happening?

15  A    I've heard of it happening, yes.

16       MR. NEMZEN:  That's all.

17       THE COURT:  Thank you.  Re-direct?

18                 **RE-DIRECT EXAMINATION**

19  BY MR. WALTERS:

20  Q    Officer Fillingham, Mr. Nemzen was asking you about

21  certain tools of the trade.  Do you recall that line of

22  questioning?

23  A    Yes, I do.

24  Q    Based on your education, training and experience,

25  would you consider a loaded handgun with one round

1    A    It's approximately 20 blocks.

2    Q    Did you on the night of January 1, 2003 respond to a

3    traffic stop?

4    A    I went to Officer Fillingham's traffic stop that he

5    was on at the 300 block of West Jackson.

6    Q    Why did you go there?

7    A    It's common practice for us to go to other officers'

8    traffic stops, to drive by, see how things are going.

9    Q    Was there anything or anyone else with you when you

10   went there?

11   A    Just my dog.

12   Q    And when you got to the Ayerco West filling station,

13   what you did do?

14   A    I talked to Officer Fillingham briefly and he

15   requested that I do a walk-around with my K-9.

16   Q    Did you comply with his request?

17   A    Yes, I did.

18   Q    Would you please describe for us what you did with

19   your K-9?

20   A    I took the dog up to the rear portion of the car and

21   I started him sniffing there.  The walk-around is a free

22   air sniff where there's no intrusion upon the property.  I

23   just have the dog sniff the outside of the vehicle.

24        So I proceeded down the passenger side, around

25   the front to the driver's side, and then as I come upon --

1    then I returned to my original spot, which would be the

2    trunk again.  Then as he was sniffing at the trunk on the

3    return after I had gone once around the car, he alerted on

4    the trunk.  And then we started back up on the driver's

5    side again and he alerted on the rear fender on the left

6    side or driver's side.

7    Q    Would you please describe for us how your K-9 alerts?

8    A    It's an aggressive alert, which means he'll scratch,

9    bark, bite.  On this occasion he jumped up on the trunk

10   and was actually scratching while he jumped up on it.

11   Q    When your dog alerts, is there any way for you to

12   know what type of substance he might be alerting to at

13   that point and time?

14   A    No.  He's imprinted for certain odors, but he

15   doesn't -- there's no way for him to tell me it's a

16   certain odor.  It's just one of the ones he has been

17   trained to alert to.

18   Q    After your K-9 alerted, what, if anything, did you

19   do?

20   A    I secured my dog and then I told Officer Fillingham

21   what had occurred with my walk-around, that he had

22   alerted.

23   Q    Were you done with your answer?

24   A    That he had alerted.  I said he had alerted on the

25   trunk.

1    Q    Could you describe for us what a holding cell is?

2    A    It's a place where we take a prisoner from the

3    officer, take him in to do an initial search before we put

4    them into the general population.

5    Q    Was there anyone with you when you were taking the

6    defendant into this holding cell?

7    A    Yes, sir.  My partner of the night, Officer Waddell.

8    Q    Officer Waddell is who?

9    A    He was my partner that evening.

10   Q    Another correctional officer?

11   A    Yes.

12   Q    When you entered the holding cell with the defendant,

13   what did you do?

14   A    Take the handcuffs off, have them put their hands on

15   the wall.  Had him put his hands on the wall before his

16   head so you can do an initial search for weapons,

17   contraband.

18   Q    Can you describe this initial search for us, please?

19   A    We were searching for any hard metal object, knife,

20   something of that extent.

21   Q    Just so I understand, this search would be --

22   A    It's on the outside, just a basic pat down search.

23   Q    Do you recall if the defendant had a coat on this

24   evening?

25   A    Yes, he did.

1  Q    Could you describe that coat for us?

2  A    Yes.  A dark winter coat, probably about waist

3  length.

4  Q    So your initial search of the defendant didn't turn

5  up anything?  No contraband?

6  A    No, sir.

7  Q    No weapons?

8  A    No, sir.

9  Q    What did you do after that?

10  A    We had him remove his coat so we could do another

11  quick search and --

12  Q    So the defendant is still up against the wall?

13  A    Yes.  I had him turn towards me at an angle from me,

14  had him remove his coat.

15  Q    As he was removing his coat, what happened?

16  A    A clear plastic bag fell on the floor.

17  Q    So why did you ask him to remove his coat?

18  A    So we could do another search.

19  Q    When the plastic bag fell onto the floor, what did

20  you do?

21  A    I put my right hand against the subject's shoulder to

22  keep him from it, put my foot on it, pulled it away from

23  him, picked it up, handed to it my partner who was

24  standing in the door.

25  Q    Your partner being?

1    A    Officer Waddell.

2    Q    So you pick up the package, hand it to your partner,

3    and then what do you do with the defendant?

4    A    I go ahead and finish the search of his coat.  We

5    have him sit until we can get him out to put him in

6    population, change him out, put him in population.

7    Q    Let me back up one second.  So you continue the

8    search of the defendant?  You go ahead and search the rest

9    of his person?

10    A    Yes.

11    Q    Search his coat?

12    A    Yes.

13    Q    Search the rest of his articles of clothing?

14    A    Yes.

15    Q    Then you said you put him into the jail population?

16    A    Yes, sir.

17    Q    Did you recover anything else from the defendant that

18    evening?

19    A    $100.00 was all I remember taking from him.

20    Q    After securing the defendant, what did you do?  After

21    you secured him in the jail, what did you do?

22    A    After securing him in the holding cell?

23    Q    Yes.

24    A    We placed -- I got -- I retrieved the bag from

25    officer Waddell and turned it over to Officer Fillingham.

1    Q     Let me back up one second.  So you retrieved the

2    crack?

3    A     Yes, sir.

4    Q     From Officer Waddell?

5    A     Yes, sir.

6    Q     Then you placed a telephone call?

7    A     I had dispatch call Officer Fillingham, let him know

8    what we had come up with.

9    Q     So you called the officer to say, "We found some

10   contraband"?

11   A     Yes.

12   Q     Then you gave that contraband to Officer Fillingham?

13   A     Yes, sir.

14   Q     Officer, could you describe for us the package that

15   fell on the floor from the defendant?

16   A     Clear plastic bag with numerous cream-colored rocks

17   individually wrapped.

18   Q     Did you recover any other drug paraphernalia on the

19   defendant?

20   A     No, sir.

21   Q     Officer, I'm going to show you what has been marked

22   Government Exhibit No. 1A-1.  Do you recognize it?

23   A     Looks like the bag that had the crack in it.

24   Q     So are you testifying that's the outer bag?

25   A     Yes.

1          MR. MURPHY:  It will indeed save a considerable

2    amount of time and, if counsel would permit, I will simply

3    do that in the form of leading questions.

4          MR. NEMZEN:  I have no objection.

5    BY MR. MURPHY:

6    Q    Officer Moore, did the initial training at the police

7    training institute follow your hiring at the Peoria Police

8    Department?

9    A    Yes, it did.

10   Q    How many weeks or months was that training?

11   A    It was a 400 hour course, approximately ten weeks

12   long.

13   Q    Did a portion of that deal with drug identification

14   and packaging?

15   A    Some of it did, yes.

16   Q    Let me direct your attention on to the year of 1994.

17   In about May of that year, did you attend a two week

18   school put on by the Drug Enforcement Administration?

19   A    Yes.

20   Q    Were you trained in the identification and packaging

21   and methods of sale and manufacturing of certain drugs?

22   A    Yes.

23   Q    Did that include crack cocaine?

24   A    That's correct.

25   Q    Also in October of 1993, if I might back up, did you

1    attend a one week training at the University of Northern

2    Florida?

3    A     Yes.

4    Q     Was part of that training in the packaging and

5    transportation of drugs?

6    A     That's correct.

7    Q     Was it also during that conference that you were able

8    to actually interview and interrogate certain drug

9    couriers?

10   A     We observed films and what-not on the interviews of

11   couriers.

12   Q     In addition to that training, have you had in-service

13   training both with your department and with the Illinois

14   Central College police training?

15   A     That's correct.

16   Q     Lastly, are you currently in the vice and narcotics

17   unit?

18   A     Yes.

19   Q     Do you have weekly meetings with regard to any new

20   developments in drug trafficking?

21   A     That's correct.

22   Q     Most recently have you attended a three day meth lab

23   course in February of 2001?

24   A     Yes.

25   Q     Let's go back if we can now to discuss your

1    experience above your training.  When you initially signed

2    on, were you in the patrol division until about October of

3    '89?

4    A    Until October of '89 I was assigned to the Police

5    Training Institute, but then I was assigned to vice and

6    narcotics.

7    Q    Did you have any duties with regard to being an

8    undercover buying agent starting then?

9    A    Yes.

10   Q    How long did that go on?

11   A    That didn't go on very long.  I was an officer with

12   no prior experience, so I was learning a lot being out

13   there on the street, trying to buy drugs from different

14   people in taverns and neighborhoods.

15   Q    Did you, however, make certain hand-to-hand buys on

16   the street?

17   A    Yes.

18   Q    In early 1990 did you go back to uniform patrol?

19   A    Yes.

20   Q    About a year later, in April of '91, did you take on

21   what's called the PHA walking beat?

22   A    That's correct.

23   Q    Would you describe what that is?

24   A    The walking beat is essentially a two man car that

25   works in the housing complex.  They like for officers to

1    get out on foot.  Number one, it's a lot more beneficial

2    for the officer when it comes to sneaking up on people.

3    But our efforts were concentrated mainly on arresting gang

4    members.   There was a lot of -- there was a high

5    concentration of cocaine sales, heroin sales and cannabis

6    sales that take place in the housing complex and we made

7    quite a number of arrests in the housing complex.

8    Q     In fact, did you make several hundred arrests during

9    this period of time?

10   A     Yes.

11   Q     Did you seize different drugs?

12   A     Yes, mainly cocaine, heroin and cannabis.

13   Q     Did that include crack cocaine?

14   A     Crack cocaine.

15   Q     As well, did you become even more familiar with the

16   packaging methods used for crack cocaine?

17   A     That's correct.

18   Q     And did you from time to time seize weapons involved

19   in the drug trafficking trade?

20   A     Yes.

21   Q     Now in January of '95 did you move on to vice and

22   narcotics?

23   A     Yes.

24   Q     That's a different division in your Peoria Police

25   Department, right?

```
 1   A     That's correct.

 2   Q     Did you again begin working undercover and executing

 3   search warrants, etcetera?

 4   A     Yes.

 5   Q     Is that where you were this afternoon?

 6   A     Yes, at a search warrant.

 7   Q     Did you make many hand-to-hand buys then?

 8   A     I made probably maybe two dozen hand-to-hand buys

 9   just from street level dealers.

10   Q     Did you also concentrate on surveillance of street

11   level dealers?

12   A     Yes.

13   Q     And drug houses?

14   A     Hours and hours of surveillance.

15   Q     Now in 1998 did you become the field training

16   officer?

17   A     Yes.

18   Q     What are those responsibilities?

19   A     Field training officer is primarily to receive new

20   recruits fresh out of the Police Training Institute or

21   officers that have been hired out from another agency that

22   don't require PTI training and the field training officer

23   instructs them on the ways that the Peoria Police

24   Department conducts their police business, rules and

25   regulations, as well as applying the law the way we do.
```

1    Q    In 1999 did you join the Street Crimes Unit?

2    A    Yes.

3    Q    What were you doing any differently than you were

4    before when you joined the Street Crimes Unit?

5    A    Street Crimes is primarily the same -- the goals are

6    the same in the unit as they were in the walking beat, but

7    you targeted neighborhoods, actual neighborhoods where the

8    single family homes were located that were deemed trouble

9    spots or hot spots with gang activity and drug sales.

10    Q    Again, were you working undercover?

11    A    Not in the Street Crimes Unit, no.  Occasionally we

12    would go plain clothes in unmarked vehicles just to get a

13    little closer to people selling drugs or crimes on the

14    street.

15    Q    In 2001 did you go back to Special Investigations?

16    A    Yes.

17    Q    Did that cause you to go back working undercover at

18    all?

19    A    Actually no.  I haven't done any undercover work

20    since my reassignment to the Special Investigation

21    Division.

22    Q    Did you begin recruiting informants however?

23    A    Yes.

24    Q    Can you tell us where the informants come from?

25    A    Sometimes we're forced to just go to the county jail,

1    actually take the initiative and interview certain

2    persons.  You look for certain people that have been

3    arrested for retail theft, forgeries, petty thefts.  Those

4    are real common among drug users.  If you have a good

5    enough sales pitch, you go out to this person, letting

6    them know that any cooperation they do for us would be

7    anonymous.  And we do a lot of things that keep informants

8    anonymous.  Then we're able to get someone like them who

9    can go into a house and purchase cocaine or cannabis or

10   heroin so that we can get evidence to prepare a search

11   warrant.

12   Q    They are primarily then users?

13   A    Primarily users, yes.

14   Q    Did you also interview a number of crack cocaine

15   dealers?

16   A    Yes.

17   Q    Is it fair to say at all levels of the distribution

18   chain?

19   A    That's correct.

20   Q    Officer Moore, have you become familiar with how

21   drugs, and especially crack cocaine, is used, packaged

22   distributed and sold in Central Illinois?

23   A    Yes, I have.

24   Q    Have you become so familiar based on the training and

25   experience that we've talked about?

1    A    Yes.

2    Q    For the past ten years have you had contact with the

3    means and methods of drug trafficking in Central Illinois?

4    A    Yes.

5    Q    Have you become familiar with the pricing of crack

6    cocaine at all levels?

7    A    Yes.

8    Q    Have you become familiar with the means and the

9    methods of distributing different quantities of crack

10   cocaine?

11   A    Yes.

12   Q    Have you become familiar with the means and methods

13   of packaging crack cocaine for distribution?

14   A    Yes.

15   Q    Have you become familiar with the use of firearms as

16   relates to the drug trafficking trade?

17   A    Yes.

18   Q    Have you had occasion to testify as an expert witness

19   on the means and method of crack cocaine distribution in

20   Central Illinois?

21   A    Yes, I have.

22   Q    On how many occasions?

23   A    Approximately a dozen times.

24   Q    How many here in federal court?

25   A    I would say about a half dozen times, six times.

1          MR. MURPHY:  At this time, Your Honor, we would

2     ask that the witness be now qualified to render an opinion

3     with regard to the means and methods of drug trafficking,

4     especially crack cocaine, here in Central Illinois.

5          THE COURT:  So ordered, especially in view of

6     the stipulation.

7          MR. NEMZEN:  I have no voir dire.

8          THE COURT:  So ordered.

9     Q    Officer Moore, I have three exhibits I want you to

10    take a quick look at.  Tell us what the number of that

11    first one is.

12    A    Government Exhibit No. 6.

13    Q    Can you tell if that's a quantity of cash?

14    A    Yes.

15    Q    Does that appear to be five 20-dollar bills?

16    A    Yes.

17    Q    Would you assume for purposes of the opinion that I'm

18    going to ask you to render that that $100 was taken off

19    the person of the defendant on January 1 of this year

20    after his late evening arrest at about 11:15 p.m. on that

21    date by the local -- by a correctional officer at the

22    local county jail in McDonough County, okay?

23    A    Okay.

24    Q    Would you put that down now and pick up the next one?

25    I think that's Government Exhibit 2, the firearm.

1   cocaine comes to be cocaine base or crack?

2   A    Yes.

3   Q    Briefly, if you would explain that to us.

4   A    Powder cocaine is an acid and it's -- crack cocaine,

5   another term for it, it's called base cocaine because when

6   a person -- what they do with the powder cocaine,

7   depending on the quality of the powder cocaine that you

8   buy, to revert it to base cocaine, that's going to affect

9   your yield or how much base cocaine is the result of

10  turning the powder back into a base, which essentially the

11  state of cocaine is actually a base before we get it here

12  in the United States from South America.  It's a base

13  cocaine and then it's turned into a powder and then people

14  in the United States for some reason found out a way to

15  revert it back to a base which is a lot more potent than

16  it is in powder form.

17          The process is very simple.  If you have one

18  ounce of cocaine, high quality cocaine, cocaine that is

19  still in chunk form as if it came off a kilogram package,

20  that's about as pure as you're going to get.  That

21  cocaine, if you want to take half that ounce, 14 grams, a

22  small amount of baking soda, not much, maybe a tablespoon

23  or two, mix that initially into a container, stainless

24  steel measuring cup, with water.  In the meantime you have

25  water that's boiling on the stove or about to come to a

1    boil.  When you add that to the boiling water, the

2    cocaine -- or excuse me -- the baking soda reacts with the

3    acid and you'll see an oil start to build up in the slow

4    roll of the boil in the hot water that's on the stove.

5    That oil is cocaine base.  You let it cool down, try to

6    separate the oil from all the other junk particles added

7    in the cocaine, and that boil when it's left to cool is

8    cocaine base or crack cocaine.

9         Once it gets a little bit firmer, you can cut it

10   into any size you want, anywhere from ounce size up to --

11   all the way down to a 10-dollar rock of cocaine.  Then if

12   you -- like I said, if the quality was high enough that

13   you started with, your yield would almost be one to one,

14   but you're never going to get one to one.  At best, buying

15   cocaine here in Central Illinois, you might get 50 percent

16   of the weight that you started with as your final product

17   for crack cocaine or base cocaine.

18   Q    In your experience -- or is this crack cocaine

19   consistent with the crack cocaine you have had experience

20   with?  Specifically is it in a rock-like form and is it in

21   that off-white color?

22   A    It's very consistent, typical crack cocaine.

23        MR. MURPHY:  Thank you, Judge.  Those are my

24   questions.

25

1                              **CROSS EXAMINATION**

2    BY MR. NEMZEN:

3    Q    Officer Moore, you have just given us an opinion,

4    have you not?

5    A    Yes, sir.

6    Q    It's just that, an opinion, isn't it?

7    A    Yes, sir.

8    Q    Now you have reached that conclusion based upon your

9    experience and review of the reports and other information

10   pertaining to this case itself; is that right?

11   A    I haven't seen a report regarding this case.

12   Q    You haven't seen a report?

13   A    No.

14   Q    So did you speak with the U.S. Attorney regarding

15   this case?

16   A    Yes.

17   Q    And he never showed you any of the police reports?

18   A    He just told me -- talked to me about the evidence.

19   Q    Now are you aware that -- strike that.  You have

20   talked about these various factors which would make you

21   render your opinion that the cocaine base or the crack

22   cocaine was consent with distribution?

23   A    Yes.

24   Q    You have talked about the amount, the prices and the

25   manner in which users ingest?

```
 1   A    I don't think I talked about how users ingest.

 2   Q    And the prices.  Now based upon your experience as a

 3   police officer over the number of years, you have also

 4   dealt with people who are dealing in crack cocaine; is

 5   that right?

 6   A    Yes.

 7   Q    You have actually executed search warrants?

 8   A    Yes.

 9   Q    You have used informants?

10   A    Correct.

11   Q    You have participated in undercover buys?

12   A    Yes.

13   Q    Controlled buys?

14   A    Correct.

15   Q    So is it fair to say over the years, based upon your

16   experience, you have learned certain things that are

17   indicia of intent to deliver; is that right?

18   A    Correct.

19   Q    You spoke about the packaging here, the gross amount

20   of the weight and the weapon; is that right?

21   A    Yes.

22   Q    Now in regards to indicia of intent to distribute, by

23   that I mean to say indications that someone is dealing,

24   there are certain things that dealers typically have to

25   ply their trade; is that right?
```

129

1    A    Yes.

2    Q    And you mentioned that you have executed search

3    warrants?

4    A    Correct.

5    Q    Would these be search warrants on individual dealer's

6    homes or residences?

7    A    Yes.

8    Q    Is it unusual to find during the course of search

9    warrants -- by the way, search warrants are generally a

10   culmination of an investigation, right?

11   A    Correct.

12   Q    Where you either have information provided to you and

13   you act upon that or you have surveillance by an officer?

14   A    That's correct.

15   Q    Or you have a combination of both, surveillance after

16   receiving information?

17   A    Correct.

18   Q    When you have executed those search warrants, you go

19   into residences of individuals suspected of trafficking;

20   is that right?

21   A    Yes.

22   Q    Is it unusual to find items where they would

23   communicate with the people they're selling to, such as

24   cell phones?

25   A    No.

130

1    Q    That's a usual thing, is it not?

2    A    Correct.  It's not unusual.

3    Q    And it would be common place to find pagers or

4    beepers?

5    A    Sometimes, yeah.

6    Q    Especially on the street level dealers because they

7    want to be in communication and they will pass out their

8    pager number and whoever the user might be that wants to

9    contact them, they will have that way of communicating?

10   A    Right.  They still have pagers.  It's not actually as

11   prevalent as it was before because cell phones are so

12   cheap anymore.

13   Q    Also, when you hit the residence, these places that

14   are the subject of the search warrant -- you talked about

15   how to cook cocaine.  You might expect to find cooking

16   materials?

17   A    It's very rare actually.  We do occasionally at a

18   search warrant, but we don't -- honestly we don't find

19   cooking utensils for cooking cocaine.

20   Q    It's not unusual to find scales, is it?

21   A    Oh, no.  That's normal.

22   Q    That's a no brainer?

23   A    Correct.

24   Q    And it's not unusual to find packaging such as the

25   sandwich bags that the dealer would use the corners?

1  A    Correct.

2  Q    It's not unusual, if someone is inclined, rather than

3  to tie these bags, they can heat seal them; is that

4  correct?

5  A    That's correct.

6  Q    So you've found -- in your execution of search

7  warrants you've found seal-a-meal gadgets, am I right,

8  heating gadgets that can seal the plastic shut?

9  A    No.

10  Q    You've never found that?

11  A    No.  You can heat it up with a pair of scissors and

12  do it that way.

13  Q    Razors?

14  A    Yes.

15  Q    For cutting?

16  A    Uh-huh.  Correct.

17  Q    And those razors might have residue on them?

18  A    Yes.

19  Q    And certainly large amounts of cash?  Not unusual?

20  A    It varies.  Sometimes no cash, sometimes little cash,

21  sometimes a lot.

22  Q    Is it unusual to find a lot of cash in these houses

23  you hit?

24  A    Is it unusual?

25  Q    Yeah.

1    A    No.  We do get -- on some search warrants we'll get

2    several thousand dollars, but in a case like that we don't

3    get much cocaine.

4    Q    Now by the way, you were told the car Mr. Cooks was

5    driving was a 1999 Chevy Malibu?

6    A    I was not told that, no.

7    Q    You said something about drug dealers having to have

8    a weapon when they're out selling drugs at night.  You

9    didn't receive any information from anybody in this case

10    that Mr. Cooks was out selling his wares at night, did

11    you?

12    A    No.

13    Q    You didn't receive any information from the U.S.

14    Attorney or anyone else prosecuting this case that he had

15    just been selling drugs that night, did you?

16    A    No, I did not.

17    Q    You don't know where he had received these drugs or

18    the circumstances where he gained possession, do you?

19    A    I do not.

20    Q    And you do agree that it's possible for someone who

21    is inclined to use this to buy multiple packages?

22    A    It's possible, yes.

23    Q    Now you also talked about late at night when someone

24    is out selling their goods, not only will they have --

25    they may have protection?  If not other people protecting

1    them, they may have a weapon protecting them?

2    A    Right.

3    Q    That's to protect their pocket full of cash; is that

4    right?

5    A    Yes.

6    Q    $100, is that a pocket full of cash?

7    A    No, it's not.

8    Q    Now you're not aware of any surveillance having been

9    done in this case, are you?

10   A    No, I'm not.

11   Q    Or any prior information regarding Mr. Cooks, any

12   narcotics activity?

13   A    No.

14   Q    Now are you aware there was a search warrant issued

15   and executed at his residence?

16   A    No, I was not.

17   Q    Now you talked about informants a bit earlier.  How

18   often -- it's not unusual rather for you to go to a county

19   jail and get a criminal out of the county jail where maybe

20   a petty crime has been committed, some kind of theft or

21   forgery, those kind of property crimes, and they may --

22   A    I'm sorry.  Go ahead.

23   Q    They may be a user; am I right?

24   A    Yes.

25   Q    Those are the kinds of people that sometimes you sign

1   up as informants?

2   A    Yes, but we don't get them out of jail.  I just want

3   you to know.

4   Q    I understand that.  Pardon my expression.  But you do

5   use these petty criminals who have property crimes in

6   their background?

7   A    We do.  And not only users, but we have used actual

8   dealers.

9   Q    And these informants that you have used in the past,

10  they will often times give you information as to who their

11  source might be?

12  A    Correct.

13  Q    That could be the beginning of an investigation?

14  A    That's correct.

15  Q    That culminates in the issuance of a search warrant?

16  A    That's correct.

17  Q    And the execution of the search warrant?

18  A    Yes, sir.

19  Q    Now you have done that in Peoria; is that right?

20  A    Yes.

21  Q    That's an urban area obviously?

22  A    Yes.

23  Q    Are you familiar with Macomb?

24  A    No, I'm not.

25  Q    Do you know if that's an urban area?

1    A    College town I think.  I don't know.

2    Q    Would you be familiar -- do other -- the manner in

3    which you sign up and use informants and receive

4    informants, that's not unique to Peoria, is it?

5    A    Oh, no.

6    Q    So in Macomb, if they're using informants there, they

7    may provide information as to who the various dealers are

8    throughout Macomb?

9    A    That's correct.

10    Q    You also talked about the quality of the narcotics

11    here.  We don't know, do we, the qualitative -- the purity

12    of this cocaine, do we?

13    A    I don't, no.

14    Q    So we don't know if it's good quality or a quality

15    that's going to be further cut for resale or if that's the

16    final product?

17    A    That's pretty much the final product.

18    Q    We don't know the purity of it, the quality of the

19    analysis?

20    A    That's correct.

21    Q    You said that it was not unusual -- I think your

22    words were that a user would generally not have a weapon

23    to protect what he's using; is that right?

24    A    Correct.

25    Q    Officer, do you know a DEA Agent John Schaefer?

1    A    I don't believe so.

2    Q    He has been used as an expert witness before in the

3    Central District of Illinois.

4    A    I don't know him.

5    Q    If he were to say -- would you disagree with this?

6    If an expert, John Schaefer from the DEA, were to say that

7    a mere user of crack would not necessarily carry a pipe

8    and might carry a gun to protect himself, would you agree

9    or disagree with that?

10    A    Could you repeat that just so I make sure I heard it

11    right?

12    Q    If DEA agent John Schaefer were to say as an expert

13    in the area of narcotics such as yourself that a mere user

14    of crack would not necessarily carry a pipe and might

15    carry a gun to protect himself, would you agree or

16    disagree with that?

17    A    I would have to disagree with that.

18    Q    But people do disagree?  Reasonable people disagree?

19    A    Sure.

20         MR. NEMZEN:  That's all I have, Your Honor.

21         THE COURT:  Thank you.  Any re-direct?

22                    **RE-DIRECT EXAMINATION**

23    BY MR. MURPHY:

24    Q    As far as this just being an opinion, Officer Moore,

25    did you relate to us your experience and your training

1    address the Court?

2            THE COURT:   You may.

3            MR. NEMZEN:   Judge, I know the Court has

4    received my motion captioned "Motion to Instruct Jury on

5    Lesser Included Offense of Possession of Cocaine Base".   I

6    think it's apparent to the Court, as well as my making

7    clear in my remarks before trial, that our theory of the

8    defense is that the Government cannot meet their burden of

9    proof beyond a reasonable doubt.   We are not assuming any

10   burden.   The burden remains with the people and our

11   position is that the Government cannot prove the

12   possession with intent rather than our having proved that

13   it was for simple possession.

14            THE COURT:   I agree that that's the Government's

15   burden.   No question about it.   The question is whether or

16   not it simply goes to the jury without a lesser included

17.  offense, which means the Government still bears the burden

18   of proof beyond a reasonable doubt or whether they would

19   be instructed in the alternative.

20            MR. NEMZEN:   And I would assume, Your Honor,

21   actually looking to the Court for guidance, if you're

22   not -- if it's not given, if we are still free to argue

23   they have not met their burden.

24            THE COURT:   Absolutely.

25            MR. NEMZEN:   I would ask Your Honor to refer --

1    first of all, I think the Government is conceding that

2    possession is a lesser included offense, so that is -- is

3    that correct, Mr. Walters?

4            MR. WALTERS:  There's no contest about that,

5    that mere possession is lesser included.

6            MR. NEMZEN:  I think their position is that

7    there would be derth, if not lack, of any evidence in the

8    record of personal use and therefore no rational jury

9    could so find and I'm asking the Court, who is now in a

10   position -- you've heard the evidence at trial -- to find

11   that there is evidence that a rational jury could rely on

12   to find the defendant not guilty of the possession with

13   intent to deliver and possession, simple possession.

14           THE COURT:  Well, what distinguishes this from

15   the situation that -- the cases that the Government relies

16   upon, what they have to say basically is that not every

17   case -- not every time a person is charged with possession

18   with intent to deliver is a lesser included offense

19   instruction appropriate.  You have to have some factual

20   basis upon which the jury could come to that alternative

21   conclusion.  What are the facts -- what is there in the

22   record at this time that would indicate that there is a

23   sufficient factual predicate in the record to justify

24   this?

25           MR. NEMZEN:  Well, before I get to that, if I

1    just might -- I know the Court is not holding us to any

2    burden.

3            THE COURT:  I'm not holding you to any burden.

4            MR. NEMZEN:  It seems to me when I read the

5    cases on this that generally the instruction is given

6    when -- I'm going to use the word sharply contrasting

7    testimony is presented by the defense.  In other words, if

8    the Government's position all along is that the defendant

9    possessed with intent to deliver and the defendant got up

10   there and said "no, it was for personal use", obviously

11   that would be sharply contrasted and to me -- I'm only

12   addressing the case law -- that would seem to impose a

13   burden on the defendant to come forward with evidence that

14   he possessed it for use.  We have not taken that burden

15   and presented no evidence.  But to refer to the record

16   before the Court now, I would suggest --

17           THE COURT:  Let me stop you for just a moment.

18   I do want the record to be very clear.  I'm not suggesting

19   that you have any burden in this respect, but I do think

20   that in coming to this conclusion, based on my

21   understanding of the cases, the cases do say that there

22   must be some factual predicate as a foundation for the

23   Court to find that a lesser included offense instruction

24   is appropriate.

25           MR. NEMZEN:  May I respond?

1          THE COURT:  Sure.

2          MR. NEMZEN:  I certainly know the Court is not

3     making us assume any burden, but I have a quarrel, I

4     think, with the cases itself which seem to me to impose a

5     burden on the defendant.  I just want to make that

6     statement.  But as far as the factual --

7          THE COURT:  If we're talking about Seventh

8     Circuit cases, we do have a hierarchical structure in our

9     court system.  You do recognize that.

10         MR. NEMZEN:  I do, Judge.  I would simply point

11    as a factual basis, I know that Officer Moore testified

12    regarding the use of marijuana, but there was some

13    evidence in the record that obviously the defendant

14    admitted to smoking cannabis the day before or at about

15    the time of the arrest.  Cannabis was found.  Cannabis

16    seeds were found in the car.  I'm going to take that and

17    extrapolate that the jury can conclude that the defendant

18    does use narcotics.  There was no evidence specifically of

19    controlled substance, but there is evidence in the record

20    that he uses marijuana and that he's a user of some sort

21    of contraband and that would be the evidence in the record

22    that I would alluding to in asking the Court to allow the

23    instruction.  I might point out that there's a reason --

24         THE COURT:  Let me stop you there a moment.  How

25    does that -- assuming this jury, without dispute, goes to

1    the jury room believing that the defendant had recently

2    used marijuana, how is that -- how does that somehow

3    create a foundation for saying that the crack cocaine on

4    his person was for personal use only?

5                MR. NEMZEN:  Well, I will agree that there is no

6    direct evidence in the record that he is a user of crack.

7    My position would be that there is some evidence, however

8    slight, and I know that Illinois law might require slight

9    evidence before an instruction is given, but I would

10   submit, Your Honor, that the fact he has used cannabis, he

11   used an elicit substance, albeit there is no evidence it

12   was crack cocaine or cocaine at all, but that would allow

13   the jury to make the inference, reasonable inference, that

14   he is a user.

15               THE COURT:  You mean since he used one

16   substance, that is marijuana, that that's consistent with

17   the finding that he also used another substance?

18               MR. NEMZEN:  That would be what I would argue

19   from the facts and the matters before the jury.

20               THE COURT:  Do you have any argument?

21               MR. NEMZEN:  There's a recent case of Hernandez,

22   in my materials I sent to the Court.  I mentioned that and

23   I think the Government is aware of U.S. vs. Hernandez,

24   330 Fed. 3rd 964, 2003 Seventh Circuit case.  I just

25   wanted to compare that case to this case.

1       That case does state that possessing a small

2  amount of cocaine is simply insufficient alone to require

3  the lesser included offense.  It goes in accord with what

4  Your Honor has said.  In that case the Appellate Court, in

5  affirming the Trial Court's decision not to instruct the

6  jury on simple possession, said that:  "The record is

7  devoid of any evidence that the defendants possessed these

8  drugs for any purpose other than to distribute them."

9       In that case, it was a multi-defendant

10  conspiracy.  There were tape recorded conversations, there

11  were audio tapes, there were informants, there were

12  controlled buys, undercover purchases.  I contrast that

13  with the evidence before this Court, which I believe is

14  lacking considerably and pales in comparison to the

15  overwhelming evidence of intent to deliver in Hernandez.

16       Our position here is the fact there was

17  marijuana being smoked in the car, the fact that there was

18  no other evidence, no scales, no other indicia of intent

19  other than the packaging and the weapon, that there is a

20  basis for a rational jury to so find on the lesser offense

21  of possession.

22       THE COURT:  All right.  Thank you.  What's the

23  Government's response?

24       MR. WALTERS:  Your Honor, the Government's

25  response is that there is a derth of evidence that there

1  is any personal use by this defendant of crack cocaine.  I

2  don't believe the fact that there is evidence that he used

3  cannabis or marijuana, that that would allow the jury to

4  make the inferential jump to well, therefore, he must be

5  also using crack cocaine.  There is no physical evidence

6  in the case indicating personal use of crack cocaine as

7  brought out in the testimony either in the defendant's

8  possession or in his home during the consent to search.

9  Because there is a lack of evidence of personal use, we

10  believe the instructions must stay as they are now because

11  otherwise it would require the jury to speculate.

12          THE COURT:  What is your position as to what the

13  Seventh Circuit cases require there be in the record

14  before it's appropriate for the Court to authorize the

15  instruction?

16          MR. WALTERS:  I'm reading from United States vs.

17  Chrismon, 965 F. 2d 1465.  "The evidence at trial must be

18  such that a jury could rationally find the defendant

19  guilty of a lesser offense yet acquit him of the greater."

20  It's got to be where a rational jury -- Your Honor can

21  look at this and come to the conclusion that, yes, he must

22  have had this for personal use or personal possession and

23  not with the intent to distribute.  We just respectfully

24  submit despite the quality of the defense case in this

25  case, that there is no evidence to support that.

1           THE COURT:  You're not going to suggest to me,

2    are you, if I deny this instruction, that he cannot get up

3    and argue that you have not met your burden of proof

4    beyond a reasonable doubt?

5           MR. WALTERS:  Not at all.  That's certainly his

6    prerogative of not putting on a case in chief and turning

7    around and breaking down the Government's in his closing

8    argument as far as not meeting our burden of proof.  I

9    don't think that distinguishes it from any other criminal

10   case, that he should have the absolute right of holding

11   the Government's feet to the standard of proof beyond a

12   reasonable doubt.

13          THE COURT:  What about the fact that there were

14   no -- he was very careful to point out that the defendant

15   was not in possession of a cell phone or pager at the time

16   of the stop?

17          MR. WALTERS:  Again, Your Honor, that goes

18   towards his argument of he didn't have it with the intent

19   to deliver as far as us not meeting our burden of proof.

20   But to say that the lack of a cell phone all of a sudden

21   is evidence that he personally used it is a different

22   argument, Your Honor.  The fact he didn't have a cell

23   phone doesn't necessarily mean a rational jury could find

24   that he personally used crack cocaine.  It may be where a

25   rational jury could find, hey, the lack of a cell phone

1    means the Government didn't meet their proof beyond a

2    reasonable doubt.  I think we're talking about two

3    completely different standards.

4          THE COURT:  What about the fact that when his

5    apartment was searched five days later, they found nothing

6    that would normally be used by a person who was cutting up

7    crack cocaine or packaging crack cocaine?

8          MR. WALTERS:  Again, I think the argument is

9    very similar to the lack of a cell phone.  My retort would

10   be that also they did not find any evidence indicating

11   personal use by the defendant.  And, again, Your Honor I

12   respectfully suggest that it's two different standards.

13   First, did we meet our burden of proof of possession with

14   intent to deliver and, secondly, could a rational jury

15   from the evidence in this case determine that the

16   defendant personally uses crack cocaine.

17          So, again, it's the same argument as with the

18   cell phone.  That might be enough for the jury to come

19   back and say he may have done this, but there's not enough

20   evidence.  The Government didn't meet their burden on

21   Count 1.

22          THE COURT:  All right.  Thank you.  Do you have

23   any reply?

24          MR. NEMZEN:  No, I don't, Your Honor.

25          THE COURT:  Let me take a moment.  Well, of

1    course this is a serious issue in this case and I take it

2    very seriously.  It's my finding that there is not

3    sufficient evidence in this record to allow for

4    instructing the jury on the lesser included offense, and I

5    want to give some explanation of why I'm making that

6    decision.

7            There is no dispute about much of the evidence

8    here.  The defendant was stopped.  The gun was in the car.

9    The drugs were on his person.  They were discovered at the

10   jail.  There was detailed testimony concerning the

11   packaging, which is -- how many different packets were

12   there?

13           MR. NEMZEN:  Twenty-seven.

14           THE COURT:  Twenty-seven different packets,

15   varying amounts, the testimony of the expert witness,

16   which was basically unrefuted.  And, again, I'm not

17   assigning any burden on the part of the defendant to prove

18   his innocence, but the point I'm making is the cases

19   suggest that you have to have something more than just

20   saying "I want the jury instructed".

21           Here, defense counsel is very aggressively and

22   effectively arguing as best he can under this record that

23   somehow the use of cannabis by the defendant, the fact

24   that he did not have a cell phone, the fact that five days

25   after the incident in question when they searched his

1    apartment that they did not find a scale or anything else

2    that would indicate that his apartment had been used for

3    cutting or packaging crack cocaine, that those types of

4    things, either taken separately or together, are enough to

5    create this beachhead for the lesser included offense.

6    With all due respect, I simply don't think that's the

7    case.

8          I'm not sure how the dictionary defines dearth,

9    but I think this is a dearth of evidence.  The affirmative

10   testimony is that we have the packaging in 27 different

11   plastic parts of plastic baggies.  We have the testimony

12   concerning the very considerable value of the crack

13   cocaine.  I think the street value of it was estimated --

14   the gross street value was estimated at over $4,000.  It

15   was estimated as being more than a two week supply.  The

16   amount, the value, the packaging, everything in the record

17   appears to indicate that it was consistent with possession

18   with intent to distribute.

19         The items that defense counsel has brought to

20   the Court's attention, while they may be sufficient to

21   cause the jury to conclude that the Government has failed

22   to establish proof beyond a reasonable doubt, are not

23   enough in my mind to establish the factual predicate for a

24   lesser include included offense instruction, so with all

25   due respect I'm going to deny the lesser included offense.

1                    IN THE UNITED STATES DISTRICT COURT
2                 FOR THE CENTRAL DISTRICT OF ILLINOIS

3

UNITED STATES OF AMERICA,          )
4                                   )
                      Plaintiff,    ) Criminal No.
5                                   ) 03-10004
           vs.                      ) Peoria, Illinois
6                                   ) July 3, 2003
DERRICK COOKS,                      )
7                                   )
                      Defendant.    )
8

9

10                    JURY TRIAL PROCEEDINGS
                         VOLUME 2 OF 2

11                         BEFORE:

12                 HONORABLE MICHAEL M. MIHM
13                 United States District Judge

14                       APPEARANCES:

15                 GREGORY WALTERS, ESQ.
                   BRADLEY MURPHY, ESQ.
16             Assistant United States Attorneys
                  200 Fulton Street, Suite 400
17                   Peoria, Illinois  61602
18          (Appeared on Behalf of the Government)

19                 ROBERT NEMZEN, ESQ.
20                 2536 S. California Avenue
                   Chicago, Illinois  60608
21          (Appeared on Behalf of the Defendant)

22

23                 Karen S. Hanna, C.S.R.
24               U.S. District Court Reporter
                 Central District of Illinois
25
Proceedings recorded by mechanical stenography, transcript
produced by computer

173

1                          I N D E X

2

3                                                    PAGE

4

5    CLOSING ARGUMENT BY MR. MURPHY                 177

6    CLOSING ARGUMENT BY MR. NEMZEN                 184

7    REBUTTAL CLOSING ARGUMENT BY MR. WALTERS       194

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  will be talking to you, arguing to you.  I will ask you to

2  base your verdicts on the evidence that you received here

3  in court, on what evidence was brought forward, the gun

4  and the drugs, and all of the legitimate inferences you

5  can make from all the circumstantial evidence and not upon

6  any kind of speculation.  When you do that, the Government

7  is confident that you will return the verdicts in this

8  case that are justified by the evidence that was presented

9  and those two verdicts are verdicts of guilty of Count 1

10 and guilty of Count 2.  Thank you.

11              THE COURT:  Thank you.  Mr. Nemzen?

12                     **CLOSING ARGUMENT**

13                     **BY MR. NEMZEN**

14          If it please the Court, gentlemen, members of

15 the jury.  Well, I want to be the second to thank you and

16 I want to thank you generally for your patience and your

17 consideration and Derrick Cooks thanks you.

18          Now I'm not going to stand here before you and

19 wave the constitution and proclaim Derrick Cooks' rights

20 and I'm not going to cloak him in that American flag and

21 praise the American criminal justice system, which by the

22 way is the best in the world in my opinion, but I am going

23 to wave in front of you the indictment, the indictment

24 that contains specific charges that were brought by the

25 Government.  They chose which charges to bring and,

1  accordingly, it is the Government, as you know by now very

2  well, that must prove the charges, in Count 1, that

3  Derrick Cooks possessed the narcotics with intent to

4  distribute and, in Count 2, he possessed a firearm while

5  possessing the drugs with the intent to distribute.

6      And while I'm not going to wrap myself in that

7  flag, as I said, Derrick Cooks as he sits there right now

8  and as he sat through this entire trial, as he sits

9  through deliberations, he is wrapped in the presumption of

10  innocence, presumption of innocence that stands unless and

11  until the Government has met their burden of proof beyond

12  a reasonable doubt, and that presumption stands all the

13  way to the conclusion of the case.

14      As I said in my opening statement, this case is

15  all about the burden of proof.  Derrick Cooks has put the

16  Government to its task of meeting that burden of proof

17  beyond a reasonable doubt.  I mentioned that trials

18  involve disputes.  That is disputed.  That is the single

19  issue in this case, whether or not the Government has met

20  their burden, whether or not they can meet their burden

21  with proof beyond a reasonable doubt that at the time he

22  possessed the drugs he did so with the intent to deliver,

23  and at the time that he possessed the weapon they have

24  given you proof beyond a reasonable doubt that he

25  possessed those drugs with intent to deliver.

1    Now Judge Mihm at the conclusion of the

2  arguments, and I suspect Mr. Walters will get up here and

3  give a rebuttal argument, he will instruct you about the

4  burden of proof.  I made much ado about it because, in my

5  humble opinion, that's what this case turns on, the burden

6  of proof, and only the Government has the burden of proof.

7  We know that.  Derrick Cooks, you will be instructed, has

8  no burden of proof.  He needn't testify, he needn't

9  present any evidence, he needn't prove his innocence and

10 he needn't prove that he's a user of drugs.  Rather, the

11 Government must prove that he intended to distribute those

12 drugs.  That's where the burden stays, right here.  It

13 never leaves.

14    Yes, indeed, the facts have shown without

15 dispute that Derrick Cooks possessed the drugs.  Derrick

16 Cooks possessed the firearm.  39-some odd grams of crack

17 cocaine.  And no one is standing before you or the Court

18 and condoning the use of drugs, but this isn't a

19 referendum on the evils of drugs.  This is about whether

20 or not the Government can prove their case which they

21 brought and the charges which they have brought before

22 you.

23    39-some odd grams, 27 packages and a loaded

24 weapon.  Again, no dispute.  But that's all, ladies and

25 gentlemen, that's all the hard evidence they've given you.

187

1    Without more evidence, I submit that you would have to

2    engage in speculation, that you would have to use

3    conjecture to leap beyond a reasonable doubt to the

4    conclusion that he possessed those drugs with intent to

5    distribute.  If you find that he did not, which is what

6    we're asking you to do, then necessarily you would have to

7    find that he didn't possess the weapon while engaged in

8    that offense, trafficking of drugs.

9        What more could the Government have given you,

10   ladies and gentlemen?  We all know the resources the

11   Government has.  This is the case of the United States of

12   America vs. Derrick Cooks.  In this case alone, four

13   gentlemen sitting at counsel table.  Derrick stands alone.

14   We have heard from local police officers, local sheriff's

15   officers.  We've heard by way of stipulation from a gun

16   expert who test fired and found the weapon to be operable.

17   We've heard by way of stipulation from a forensic chemist

18   who tested the narcotics and confirmed they were in fact a

19   Schedule II controlled substance.  We've heard about a

20   fingerprint expert employed by the Government in this case

21   who testified that, by way of stipulation, that he checked

22   for fingerprint comparison the plastic bags.  And we heard

23   from Officer Bay and expert witness Moore.  Yet I submit

24   that without more, the evidence of intent to distribute is

25   lacking.

1    Why do I say that?  Let's talk first about the

2    car search.  Through the testimony of Officer Fillingham

3    and Officer Neavear, you know that there was a thorough

4    search.  It was exhaustive.  You saw Officer Fillingham at

5    times on his hands and knees going through that car.  We

6    know what he found.  But what didn't he find?  What tools

7    of the trade didn't he find that night in the car or on

8    the person of Mr. Cooks?

9    Did you hear about any large amount of money

10   that these sophisticated dope dealers or these street dope

11   dealers have?  Did you hear about that?  Lines of

12   communication are critical between a seller and his

13   buyers, his clientele.  Did we hear anything about any

14   means of communication, any cell phone?  Did we hear about

15   that?  Pagers?  Beepers?  Did we hear about any ledgers

16   indicating drug records?  Any scales?  Any kind of

17   packaging material?  Nothing.

18   Now I suspect Mr. Walters is going to get up and

19   say, "Well, what do you expect?  It's late on New Year's

20   Day.  He's driving around in his car.  He can't be

21   expected to carry around the tools of his trade."

22   But the telltale sign about the lack of

23   evidence, corroborative evidence, that establishes his

24   intent to deliver is the search of the house.  Why do I

25   say that?  Because Officer Bay, an experienced narcotics

1    enforcement officer from the West Central Illinois Drug

2    Enforcement Group, told you that he was getting involved

3    in this case because it was going to be a federal

4    prosecution.  And armed with an arrest warrant and a

5    complaint charging possession of a controlled substance

6    with intent to deliver, he goes to Derrick Cooks'

7    apartment on January 6 of this year unannounced.  He goes

8    there to serve the warrant and, by his own words, to see

9    if there was more, to see if there were more drugs,

10   indicia of intent, more weapons.  He goes there and we

11   know that's what he wanted to find because he requested

12   permission to search and Derrick Cooks gave permission to

13   search.  Now I know Mr. Walters is going to say this is

14   five days later, but the fact remains he went -- that is

15   Officer Bay went unannounced to Derrick Cooks' home in the

16   company of at least two other officers looking for more.

17            And what did you hear about the results of his

18   thorough and exhaustive search?  And those are the words.

19   I asked him if it was a thorough search.  I asked him if

20   it was an exhaustive search.  And he agreed it was a small

21   apartment.  No stone was left unturned.  Now then at the

22   house, did we hear about large sums of money from street

23   dealers?  Did we hear anything about that?  Did we even

24   here about dollar one, dime one being found in that

25   apartment?  Cell phone, pagers, beeper?

1          Now we're at someone's home.  Let's talk about
2     scales, electronic, digital, hand held.  Did we find any?
3     Even a little kitchen scale?  Anything about that?  Empty
4     sandwich bags for the corners to be cut.  Did we talk
5     about that?  Anyone hear any testimony about that?  Mix,
6     something to adulterate, to make more of a commodity to
7     sell on the street.  Did we hear anything about that?  How
8     about these cooking -- I believe it was Officer Bay who
9     told you how they cook crack cocaine.  Any type of items
10    associated with cooking of crack cocaine?  Anything seized
11    which would show any residue?  We know the lab can check
12    for residue.  Anything about that?  Any more weapons in
13    the house?  Any guard dogs?  Any sophisticated security
14    system?  Any razor blades with residue?  All indicia of
15    intent, none of which was found.

16          We also know from Officer Moore, the expert,
17    that narcotics officers have their own tools of the trade.
18    They have the ability to conduct surveillance.  They
19    have -- he was quite frank.  They have a network of
20    informants.  He would pluck someone out of a county jail.
21    He told you he would get people in jail, petty criminals.
22    I think he talked about thieves and forgers, people who
23    may depend on doing those activities to get their money so
24    they can buy drugs.  He talked about controlled buys by
25    third parties and undercover buys by police officers.  And

1    I asked him if that's what goes on in Peoria, in Macomb,

2    another urban area, if narcotics officers in that locale

3    would have the same tools of the trade and he said he

4    believed they did.  And we know that to be true because

5    Officer Bay told you that they have the same tools.  They

6    use surveillance.  They just informants.  They use

7    undercover.  They use controlled buys.

8         Now I say this -- by the way, I think Officer

9    Bay, good man doing a good job.  He believes he has his

10   finger on the pulse of drug activity in Macomb, Illinois.

11   Well, did anyone come into this court and tell you from

12   that witness stand or by stipulation, did anyone at all,

13   is there any testimony, is there any evidence, that

14   Derrick Cooks was ever under surveillance before or after

15   January 1 of 2003?  Did anyone come in and tell you there

16   was information given from any source, informants or

17   otherwise, about Derrick Cooks in Macomb?  Did anyone come

18   in, any snitch who might try to work off a deal or better

19   himself come in and tell you, "I know Derrick Cooks.  He's

20   my man.  He sells to me on the streets of Macomb."  Did

21   anyone come in and tell you they ever bought from Derrick

22   Cooks?

23        We're talking about the Government, USA vs.

24   Derrick Cooks, the vast resources they have to come up

25   with a case and this is what you've got.  This is all the

1  Government has brought you.

2      Well, the Government is going to say we brought

3  you the expert opinion of Tim Moore.  Impressive no doubt.

4  One curious thing I found in his testimony, and that may

5  be just me, is that in an effort to tell you how drug

6  dealers protect and watch over their goods and presumably

7  are on their toes at all times, yet he said unequivocally,

8  when I asked about dealers smoking marijuana, "All the

9  time."  Curious to me.

10      But, in any event, what he told you was not a

11  fact.  It was an opinion and Judge Mihm will instruct you

12  specifically in that regard and he will instruct you as

13  follows:  That you have heard a witness give opinions

14  about matters requiring special knowledge or skill.  You

15  should judge this testimony in the same way that you judge

16  the testimony of any other witness.  The fact that such a

17  person has given an opinion does not mean you are required

18  to accept it.  Give the testimony whatever weight you

19  think it deserves, considering the reasons given for the

20  opinion, the witness' qualifications and all of the other

21  evidence in this case.  And I submit all of the other lack

22  of evidence presented by the Government in this case.

23  Moore's opinion is not in any way binding on you.  You are

24  the triers of fact.  You determine what inferences are to

25  be drawn.  That is your province.

1          Derrick asked me before trial and during the
2    trial, "Do you think I can really get a fair trial?"  I
3    told him unequivocally, "Sure you can, Derrick."  He said,
4    "Why?  This is the USA vs. Derrick Cooks.  It's them
5    against me."  I simply responded that he was being tried
6    by you, a fair and impartial jury.  You, all of whom
7    stated that you would not be guided by any bias or
8    prejudice.  You, all of whom said you would base your
9    decision solely on the evidence.  You wouldn't be affected
10   by the nature of the charges, that there are weapons or
11   drugs involved.  No one is asking you to condone or
12   approve of that.  And you, who in saying your verdict
13   would be based solely on the evidence, promising not to
14   speculate or use conjecture, yes, Derrick Cooks is getting
15   a fair trial.
16         Before I sit down, I just want to say that I'm
17   going to think about this case.  I've been living with
18   this case a little bit and I'm going to think about it for
19   a long time after it concludes, tonight, tomorrow, next
20   week, and I will ask myself did I do right by Derrick
21   Cooks.  And you, too, might ask yourself the same
22   question, did I do right by Derrick Cooks.  But for you,
23   ladies and gentlemen, there is no tomorrow, there is no
24   tonight, no tomorrow, no next week.  If you have a
25   reasonable doubt, you must have it now.

1          Now you will recall in my opening statement when

2    I said to you that at the end of the case, I would call on

3    you to abide by the promises that you made and Derrick

4    Cooks is calling on you right now to abide by those

5    promises, the promise to keep the burden of proof right

6    here, the promise to presume him innocent as he sits there

7    now, the promise to try this case in a fair and impartial

8    way. I know that you will keep those promises.

9          I also told you about the Government's promise.

10   In your deliberations back in the jury room, make them

11   keep that promise. Hold them to it. But in the end, tell

12   them that they have not kept their promise. Tell them

13   with your verdict simply they have not given you proof

14   beyond a reasonable doubt. They haven't given you enough

15   evidence, not enough, not guilty.

16             THE COURT:   Thank you.  Mr. Walters?

17                **REBUTTAL CLOSING ARGUMENT**

18                     **BY MR. WALTERS**

19        Thank you, Your Honor.  I just briefly join in

20   Mr. Murphy's and Mr. Nemzen's comments of thanks to you.

21        Mr. Nemzen said what hasn't the Government shown

22   to you, folks, instead of what Mr. Murphy said, what we

23   have shown to you, as opposed to what possibly we could

24   have shown you.

25             He talked about how there was no investigation,

1    need to be able to contact you immediately.  You need to

2    be able to be back here in less than ten minutes.  Same

3    thing is true of course of the defendant.

4         If I have any communication with the jury that

5    touches on the merits of the case, I will not communicate

6    back to them before we come together and make a record as

7    to what the appropriate response should be.

8         As I said, if they are still deliberating, they

9    will order lunch.  It will be brought in to them.  They

10   will be able to deliberate over the lunch hour.  Any

11   questions?

12        I want to thank counsel for both sides.  I think

13   everyone really did a very professional job representing

14   your clients and you did that in a very civil manner and I

15   really appreciate that as the trial judge.  Thank you.

16        As to the exhibits in this case, I think we

17   touched on this yesterday, but just to be sure, as I

18   understand it there is no objection to the Government,

19   even though they have been admitted in evidence, if they

20   hold on to the exhibits so we don't have to keep them in

21   the clerk's office with the understanding that the

22   exhibits will not be destroyed or turned over to any

23   person without prior order.

24        MR. NEMZEN:  No objection.

25        THE COURT:  Thank you.

1                      *** TRANSCRIPT CONCLUDED ***

2                         REPORTER'S CERTIFICATE

3

4              I, Karen S. Hanna, certify that the

5      foregoing transcript constitutes a true and accurate

6      transcript of the original shorthand notes of the

7      proceedings had at the time and place aforesaid

8      before the HONORABLE MICHAEL M. MIHM, U.S. District

9      Judge.

10

11

12      _1-12-04_                       _Karen S. Hanna_
        Date                           Karen S. Hanna, CSR
13                                      License #084-001760

14

15

16

17

18

19

20

21

22

23

24

25

**E-FILED**
Wednesday, 06 June, 2007  08:22:04 AM
Clerk, U.S. District Court, ILCD

APPENDIX C TO THE GOVERNMENT'S RESPONSE TO
PETITIONER'S § 2255 MOTION


EXCERPTS FROM SUPPRESSION HEARING TRANSCRIPT

1

    IN THE UNITED STATES DISTRICT COURT
2   FOR THE CENTRAL DISTRICT OF ILLINOIS

3

4   UNITED STATES OF AMERICA,          )
                                       )
5                   Plaintiff,         ) Criminal No.
                                       ) 03-10004
6            vs.                       ) Peoria, Illinois
                                       ) July 3, 2003
7   DERRICK COOKS,                     )
                                       )
8                   Defendant.         )

9

10          HEARING ON MOTION TO SUPPRESS

11

12              BEFORE:          .

13       HONORABLE MICHAEL M. MIHM
         United States District Judge

14

15              APPEARANCES:

16       GREGGORY WALTERS, ESQ.
     Assistant United States Attorney
17       200 Fulton Street, Suite 400
         Peoria, Illinois  61602
     (Appeared on Behalf of the Government)

18

19

20       ROBERT NEMZEN, ESQ.
         2536 S. California Avenue
21       Chicago, Illinois  60608
     (Appeared on Behalf of the Defendant)

22

23

24       Karen S. Hanna, C.S.R.
         U.S. District Court Reporter
25       Central District of Illinois

Proceedings recorded by mechanical stenography, transcript
produced by computer

2

1

2

3
I N D E X

4

5
WITNESS
PAGE

ANTHONY FILLINGHAM
  Direct Examination by Mr. Walters          5
  Cross Examination by Mr. Nemzen            32
  Re-Direct Examination by Mr. Walters       61
  Re-Cross Examination by Mr. Nemzen         64

KENNETH NEAVEAR
  Direct Examination by Mr. Walters          67
  Cross Examination by Mr. Nemzen            79
  Re-Direct Examination by Mr. Walters       87
  Examination by the Court                   88
  Further Re-Direct Examination by Mr. Walters  88

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Unless there are other questions from the Court,

2  I will discontinue with the exception of one last point.

3  As far as 22 hits out of 59 where there is contraband, 29

4  where there wasn't, I believe Officer Fillingham's

5  testimony explained that it's based on odor.  There could

6  be residual effects.  As well, there is a plethora of case

7  law in the Seventh Circuit that probability is not a

8  balance of preponderance of the evidence, that it can even

9  be less than a preponderance and still have probable cause

10  to investigate a crime and to conduct a search of the

11  vehicle in this case.  That's all, Your Honor.

12    THE COURT:  Thank you.  Do you have any reply?

13    MR. NEMZEN:  I have no rebuttal argument.  Thank

14  you.

15    THE COURT:  Well, let me start by commending

16  counsel for both sides for the quality of your briefs and

17  your presentations here this morning.

18    The bottom line ruling in this is that I am

19  going to deny the motion to suppress and I'll explain why.

20  I think in a broad sense what Mr. Walters said is correct.

21  I think it's -- I believe that the search is justified on

22  either of two types of analysis:  One, whether at the time

23  that we get to the end of these events there was still a

24  reasonable processing of the traffic ticket going on and,

25  secondly, even aside from that, whether specific events,